## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

DOMINGO OROZCO, IRMA
OROZCO, MARK BORDELON and
ANTOINE LOUVAT, individually
and on behalf of all others similarly
situated,

|  |  |
|---|---|
| Plaintiffs, | Case No. _____ |
| vs. | **CLASS ACTION COMPLAINT** |
| FCA US, LLC, | **JURY TRIAL DEMANDED** |
| Defendant. |  |

Plaintiffs Domingo Orozco, Irma Orozco, Mark Bordelon and Antoine Louvat ("Plaintiffs") bring this action on behalf of themselves and all other similarly situated members of the below-defined classes (collectively, the "Class") against Defendant FCA US, LLC ("FCA" or "Defendant"), and allege the following based upon information and belief, the investigation of counsel, and personal knowledge as to the factual allegations pertaining to themselves.

## I.      INTRODUCTION

1.      This action arises from the false and deceptive representations made by FCA to the owners and lessees of its 2018-2021 Jeep Wrangler and 2020-2021 Jeep Gladiator off-road vehicles (the "Class Vehicles" or "Vehicles") regarding specific

components of the Vehicles that have been featured prominently and repeatedly by FCA in the marketing and advertising campaigns it designed to drive their sales.

2.     As detailed below, FCA made affirmative representations to Plaintiffs and Class members in its marketing materials regarding the aluminum body panels and parts incorporated into the all-new Jeep Wrangler and Gladiator Class Vehicles and, specifically, promoted the quality and benefits of the aluminum used on the Vehicles, when, in reality, the Class Vehicles' aluminum panels corrode and the exterior paint on its aluminum body parts bubble, flake, peel, rust and/or blister (the "Corrosion Defect" or "Defect"), due to a latent defect that manifests itself over time and exists in each Class Vehicle at the time it leaves FCA's possession and control.

3.     Plaintiffs had no way of discerning or otherwise learning facts to reveal that FCA's representations pertaining to the Class Vehicles were false and misleading, as FCA failed to disclose and knowingly concealed the Corrosion Defect from Plaintiffs (and Class members) in its marketing materials. It was only after Plaintiffs had purchased their Class Vehicles that FCA's incomplete marketing, which omitted reference to the Corrosion Defect, was revealed.

4.     Neither FCA, nor its authorized dealers—who were advised of the Corrosion Defect and provided with repair instructions in technical service bulletins ("TSBs") issued by FCA starting soon after the first model year Class Vehicle (*i.e.*, the 2018 Wrangler) was released to the public—acknowledge the Corrosion Defect

2

in response to Class member inquiries. In addition, those Class members who present their Vehicles to those dealers for repairs—as directed to by FCA—have learned that the repair provided, even if done properly, does not cure the Corrosion Defect. Moreover, FCA's remedy neither compensates Class members for the diminution of value that occurs to their Class Vehicles when they are repainted pursuant to those TSBs, or for other damages, such as out of pocket expenses incurred as a result of the Corrosion Defect.

5.     Plaintiffs and Class members have suffered ascertainable losses and actual damages as a direct and proximate result of FCA's misrepresentations and omission of the Corrosion Defect in that they: (1) overpaid for the Class Vehicles because the Defect significantly diminishes the value of the Vehicles; (2) have Vehicles that suffer premature corrosion and unsightly paint failures; and (3) must expend significant money to have their Vehicles (inadequately) repaired and repainted.

6.     Plaintiffs and Class members have purchased and leased Class Vehicles that they would not otherwise have purchased or leased, or would have paid less for, had they known of the Corrosion Defect at the point of sale.

7.     Accordingly, Plaintiffs bring claims for (1) unjust enrichment; (2) breach of express warranty; (3) violation of the Magnuson-Moss Warranty Act, 15

U.S.C. §2301, *et seq.*; and (4) violations of the consumer protection laws of the States of New York, Louisiana, and New Hampshire.

## II. THE PARTIES

8. Plaintiffs Domingo Orozco and Irma Orozco are citizens of Florida, residing in Orange County, Florida. The Orozcos purchased a new 2019 Jeep Wrangler from Huntington Jeep Chrysler Dodge Ram, an authorized FCA automobile dealership in Huntington, New York. The Orozcos were citizens of New York at the time they purchased their Class Vehicle.

9. Plaintiff Mark Bordelon is a citizen of Louisiana, residing in Lake Charles, Louisiana. Mr. Bordelon purchased a new 2018 Jeep Wrangler from Mark Dodge Chrysler Jeep Ram, an authorized FCA automobile dealership in Lake Charles, Louisiana.

10. Plaintiff Antoine Louvat is a citizen of Maine, residing in West Paris, Maine. Mr. Louvat purchased a new 2020 Jeep Gladiator from Bournival Jeep, an authorized FCA automobile dealership in Portsmouth, New Hampshire.

11. Defendant, FCA, is a Delaware limited liability company with its principal place of business in Auburn Hills, Michigan. FCA's sole member is FCA North America Holdings LLC, a Delaware limited liability company with its principal place of business in South Lyon, Michigan. At all times relevant to this action, FCA and/or its agents (itself and through its related business entities)

4

designed, manufactured, marketed, sold, serviced, distributed, and warranted the Class Vehicles throughout the United States, earning hundreds of millions of dollars in profits. FCA also developed, approved, and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles, to which Plaintiffs were exposed. Previously known as Chrysler Group LLC, Defendant, FCA, was the North American arm of Fiat Chrysler Automobiles N.V. (or "Fiat"), until its merger with Peugeot S.A., when it became a wholly-owned subsidiary of Stellantis, N.V., which was formed as a result of the merger of Fiat Chrysler Automobiles N.V. and Peugeot S.A. in 2020.

### III. JURISDICTION AND VENUE

12. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1332(d) and 1453, because (1) this action is a "class action," which contains class allegations and expressly seeks certification of a proposed class of individuals; (2) the putative Classes each consist of at least hundreds of proposed class members; (3) the citizenship of at least one class member is different from FCA's citizenship; and (4) the aggregate amount in controversy by the claims of Plaintiffs and the putative Classes exceeds $5,000,000, exclusive of interest and costs.

13. This Court also has jurisdiction over supplemental state law claims pursuant to 28 U.S.C. §1367 and jurisdiction over the Magnuson-Moss Warranty

Act claim by virtue of diversity jurisdiction being exercised under the Class Action Fairness Act ("CAFA").

14. Venue is proper in this jurisdiction pursuant to 28 U.S.C. §1391 because FCA is subject to personal jurisdiction in this District and a substantial portion of the conduct complained of herein occurred in this District.

## IV.   FACTUAL ALLEGATIONS

### A.   Background of the Corporate Average Fuel Economy Standard and the Class Vehicles.

15. In 1975, to reduce energy consumption by increasing the fuel economy of cars and light trucks or Sport Utility Vehicles ("SUV"), Congress enacted the Corporate Average Fuel Economy ("CAFE") standards as part of the implementation of the Energy Policy and Conservation Act. Initially, the CAFE standards required all new automobiles manufactured for sale in the U.S. to have an average of 27.5 miles per gallon ("mpg") by 1985.

16. In 1987, Jeep introduced its iconic Jeep Wrangler. Today, the Wrangler is still one of the most recognized vehicles, both on and off roads, in the United States. Since its inception, the Wrangler's appearance has largely remained unchanged, earning it a loyal, decades long consumer base.

17. In May 2010, the Environmental Protection Agency ("EPA") and the Department of Transportation ("DOT") issued a joint final rule mandating, by 2016, improved fuel economy to 34.1 mpg for light trucks with model years 2012-2016.

18.     In October 2012, the EPA and DOT finalized a rule requiring, by 2025, increased fuel efficiency to 54.5 mpg for new trucks with model years 2017-2025.

19.     Notwithstanding these continued regulatory changes, throughout Fiat's acquisition of Chrysler, between 2009 and 2014, Jeep's global sales remained among the highest in the market. Since the acquisition was completed in 2014, the Jeep Wrangler has sold more than double the number of vehicles in the U.S., per year, compared with all but one year (2007) from the previous decade (2000-2010).

20.     In October 2014, Chrysler's then CEO, Sergio Marchionne, announced that FCA was considering using aluminum instead of steel for the body panels of the fourth-generation Wrangler, which would help drop the weight of the Wrangler. This change was initially slated to be released for the 2017 model year.

21.     By May 2015, Mr. Marchionne confirmed that the next-generation Wrangler would be equipped with an aluminum hood, doors, and fenders to reduce the Wrangler's weight, and in July 2016 FCA announced that it would invest $700 million in the Toledo Assembly Complex---the factory that has produced Wranglers since 2006—to produce the next-generation (and lighter) Jeep Wrangler.

22.     Following this investment, and with the release of its fourth generation 2018 models in the fall of 2017, the Wrangler included the major design change of incorporating aluminum into the vehicles' body and chassis to improve fuel efficiency and ensure that, notwithstanding increasingly stringent regulatory

requirements, Wrangler would continue to be among one of the top vehicles within FCA's fleet. Indeed, the weight of the prior Wrangler models placed it near the bottom of the industry for real-world fuel economy and emissions performance.

23.     As more specifically described below, even though FCA quickly became aware that the new, aluminum design of the Wrangler could not handle the advanced construction techniques and process changes that had been implemented, FCA continued to incorporate aluminum into the subsequent model-year Wranglers.

24.     In the Spring of 2019, FCA released the 2020 Jeep Gladiator—Jeep's first new truck in almost 30 years—with the addition of a truck bed to the Wrangler's appearance to deliver more utility to the vehicle. The Gladiator, being based on the Wrangler, incorporated the same aluminum panels and parts.  As such, the Class Vehicles all suffer from the same design and/or manufacturing defect that causes its aluminum body panels to prematurely corrode and aluminum body parts bubble, flake, peel, rust and/or blister.

**B.     FCA's Knowledge of the Corrosion Defect and Contemporaneous Marketing of the Class Vehicles**

25.     Prior to the launch of the all-new 2018 Jeep Wrangler, FCA embarked on an aggressive marketing campaign that promoted the vehicle as "[t]he most capable SUV ever."

26.     FCA also boasted that the 2018 Jeep Wrangler "receive[d] a multitude of improvements" to "the legendary Jeep capability," all "while reducing weight and

improving fuel economy."  FCA further noted how the 2018 Jeep Wrangler was "built with a focus on quality, reliability and durability" and had "undergone more than 3.9 million miles of testing – one of the highest totals ever for any FCA US vehicle."

27.    In its brochures, FCA boasted that the 2018 Wrangler was "LIGHTER IN WEIGHT," noting that "[h]igh-strength, lightweight aluminum is used throughout the doors, hood, windshield frame, swing gate, and fenders to help Wrangler shed over 200 lb. It's strong, durable and aids efficiency." FCA also highlighted that the 2018 Wrangler had "EASIER-TO-REMOVE DOORS," noting that "[a]ll-aluminum construction makes these doors strong, yet very lightweight, and a built-in handle makes taking them off a breeze[,]" and that its "LIGHTWEIGHT SWING GATE," was "[c]onstructed of high-strength magnesium and aluminum that reduces overall vehicle weight and aids efficiency and operation," as well as "[n]ew exposed aluminum-forged door hinges." *Id.*

28.    FCA's marketing also noted that the 200 less pounds of weight was expected to increase the gas mileage by three miles per gallon, touting the 2018 Wrangler as "the most capable and fuel-efficient Wrangler ever produced by FCA."

29.    However, prior to publishing these marketing materials, upon information and belief, FCA would have required its suppliers to test the aluminum

to see how it performed in simulated real-world conditions and to determine its effect on other aspects of the vehicle, such as its paint.[1]

30.    Thus, FCA would have engaged in *at least* four years of development and testing of the aluminum parts prior to incorporating them into the Class vehicles. Such testing would have begun by the time FCA confirmed, in May 2015, that it would be incorporating new aluminum parts into the next generation Jeep Wrangler. In fact, in mid-2015, FCA redesigned the door hinges used on the Wrangler to avoid galvanic corrosion that had been occurring in the earlier generation Jeep Wrangler models, and FCA, again, redesigned the door hinges for the 2018 Jeep Wrangler.

31.    As a result, while details regarding the testing performed by FCA and the results of that testing are in the exclusive custody and control of FCA, the testing of the aluminum to be used in the Class Vehicles would have revealed the Corrosion Defect. Upon information and belief, FCA's observed problems with the new aluminum components was one of the reasons why FCA delayed the release of the new fourth-generation Jeep Wrangler to the 2018 model year.

---

[1] Prior to a new metal being used in the substrate of a vehicle's exterior, automakers such as FCA typically employ multiple standards and test protocols to ensure long life and film integrity of the paint system as well as the underlying substrate. This is particularly true when the incorporation of a new metal has the propensity to cause cross-metal contamination and affect the exterior panels and clearcoat of a vehicle. These tests often run over the course of two to five years before the vehicle using the new materials is brought to market.

32.     Soon after FCA's release of the 2018 Jeep Wrangler on November 29, 2017, Class members began posting and complaining about their experiences with the Corrosion Defect in their Class Vehicles on internet forums created specifically for the discussion of issues related to the Class Vehicles. FCA actively monitors these internet forums through its "JeepCares" customer service representatives. These complaints, of which FCA had actual notice through JeepCares, also detailed FCA representative and authorized dealership responses.

33.     In fact, when FCA joined JeepCherokeeClub.com, on April 4, 2016, it made clear that online customer complaints would *not* merely be a blip on FCA's radar; instead FCA personnel would actively "monitor a myriad of FCA brand forums" to ensure customer satisfaction and resolution of issues:

> Hi all, sorry for the delay!
>
> There are several of us who monitor a myriad of FCA brand forums. We are Customer Care representatives from FCA HQ and are here to assist when you have questions or concerns with your vehicle. For customers outside the United States, we can help by providing contact information for our international teams.
>
> Kori
> Jeep Social Care Specialist

69.     Other forums specific to the Class Vehicles that were monitored by FCA where Class members posted their complaints pertaining to the Corrosion Defect include WranglerForum.com, JLWranglerForum.com, and

JeepGladiatorForum.com. JeepCares joined these forums on July 19, 2011; February 1, 2018; and November 29, 2018, respectively.

70.     The complaints posted on these forums, which detailed both the failures and the responses of FCA representatives and FCA authorized dealerships in addressing the Corrosion Defect and the damage it caused, began in early 2018 and were consistently responded to by JeepCares representatives, often the next day. A review of these forums reveals thousands of posts in dozens of discussions complaining of the Corrosion Defect, demonstrating that Plaintiffs are not alone in this matter.

34.     FCA, however, knew of the Corrosion Defect in the Class Vehicles even prior to their release, as evidenced by the first of many TSBs it issued to address the Defect during the Class period.

35.     To wit, on or around March 17, 2018, FCA issued 31-001-18, entitled "Aluminum Body Panel Corrosion Repair" (the "2018 TSB"),[2] which acknowledged the Corrosion Defect in the 2018 Jeep Wrangler and involved "inspecting and if necessary removing corrosion and refinishing the suspect aluminum hood, door, or liftgate panel" in those vehicles.

---

[2] Automakers issue TSBs directly to dealers when a growing number of unanticipated problems with a vehicle are observed. Thus, the 2018 TSB would have been issued after incidents of the Corrosion Defect within the 2018 (and later models) Jeep Wranglers had been observed in the field and during testing prior to those vehicles being made publicly available for sale.

36.     The 2018 TSB diagnosed the problem as "[a]luminum corrosion along the leading edge of hood or other exterior surface areas of the doors or liftgates" and directed FCA's dealers to "[r]emove [the] affected panel" and "[g]rind the corroded areas of the hood to bare aluminum using . . . a grinding disc" before sanding the panel and preparing it to be refinished.

37.     In an attempt to enhance the adhesive properties and corrosion resistance of the coating being applied to the Class Vehicles, the 2018 TSB further directed dealers to apply pre-treatment wipes to the repair areas prior to refinishing the panel. The 2018 TSB did not provide for the replacement of the affected panel under any circumstance.

38.     On March 30, 2018, the 2018 TSB was revised through the issuance of 31-001-18 REV. A (the "Revised 2018 TSB"), to include the 2018-2019 Jeep Wrangler's "fenders" and also diagnosed the problem as "[a]luminum corrosion along the leading edge of hood or other exterior surface areas of the doors, fenders or liftgates."

39.     Like the 2018 TSB, the Revised 2018 TSB did not provide for a replacement of the affected panel and the repair procedure remained the same.

40.     On November 22, 2018, prior to the upcoming release of the 2019 Jeep Wrangler, the Revised 2018 TSB was, itself, revised through the issuance of 31-001-18 REV. B (the "Second Revised 2018 TSB").

41.    The Second Revised 2018 TSB provided examples of the Corrosion

Defect FCA had observed in the field after the 2018 Jeep Wrangler's release:



**Fig. 1**
**Examples of Corrosion Along Leading Edges**



**Fig. 2**
**Corrosion Examples**

42.    The Second Revised 2018 TSB also provided for replacement of the

affected panel to the extent "severe pitting exhibited that [could not] be removed

with sandpaper" after "removing the initial blistered paint from the panel surface

with [the] grinding disc." If the affected panel did not qualify for replacement, the

Second Revised 2018 TSB directed dealers to apply an anti-corrosion pen to the affected areas, instead of the pretreatment wipes recommended in the 2018 and Revised 2018 TSBs.

43.     Notwithstanding its above knowledge of the problems associated with its incorporation of aluminum into the Class Vehicles, FCA continued to market the benefits of the Vehicle's aluminum closures and make representations regarding the quality and durability of the Vehicles themselves.

44.     Indeed, the brochure FCA released for the 2019 Jeep Wrangler marketed the fact that its "[s]ide doors are made of lightweight aluminum and are easy to remove" and that the use of "lightweight aluminum" in its body made the "Wrangler lighter in weight."

45.     On April 4, 2019, when the all-new 2020 Jeep Gladiator was released, FCA still did not disclose its knowledge of the Corrosion Defect, which it knew affected the Gladiator in the same way it had affected the 2018-2019 model year Wrangler, given the Gladiator had incorporated the same aluminum panels and parts.

46.     On July 31, 2019, FCA issued 31-001-19 (the "2019 TSB"), which superseded the Second Revised 2018 TSB, and expanded the affected vehicles beyond those sold in North America to include those sold in the regions of Latin America, Asia Pacific, and Europe. The 2019 TSB, however, did not include the 2020 Gladiator, even though FCA knew those vehicles would meet the same fate.

47.     Instead, FCA's marketing of the 2020 Jeep Gladiator was no different than its marketing of the 2018 Jeep Wrangler. Indeed, FCA hailed the 2020 Gladiator as "[t]he most capable Jeep truck ever," noting that "[t]he use of lightweight, high-strength aluminum closures, including the doors, door hinges, hood, fender flares, windshield frame and tailgate, help curtail weight and boost fuel economy."

48.     On October 27, 2020, however, FCA issued 31-002-20 (the "2020 TSB"), which superseded the 2019 TSB and included, for the first time, the Jeep Gladiator, both model year 2020 and 2021, as well as model years 2020-2021 of the Wrangler—even though the 2021 model-year Class Vehicles had not yet been released for sale.

49.     The 2020 TSB provided the below additional example of the Corrosion Defect in the doors and hinges of the Class Vehicles that FCA had observed in the field:



Fig. 1
Examples of Bubbling

50.    Notwithstanding its release of the 2020 TSB, however, FCA continued to market the aluminum closures and their benefits to potential customers in the brochures it released for the 2021 model year Gladiator and Wrangler, without acknowledging or providing consumers notice of the known problems associated with its incorporation of the new aluminum closures and parts into those Class Vehicles.

51.    For example, the brochures for the 2021 Gladiator, like the 2021 Wrangler, touted that its "side doors . . . are made of lightweight aluminum, which makes them extremely easy to remove." FCA also highlighted the Gladiator's "lightweight aluminum tailgate," as well as other "lightweight aluminum" parts that "ma[de] every Gladiator lighter in weight." *Id.*

52.    FCA also omitted from disclosing to Plaintiffs and Class members that, *inter alia*, FCA was aware of the Defect from pre-production testing and design failure mode analysis, production design failure mode analysis, early consumer complaints made to FCA's network of exclusive dealers, aggregate warranty data compiled from those dealers, repair orders and parts data received from the dealers, consumer complaints to dealers and NHTSA as well as testing performed in response to consumer complaints.

53.    FCA's decision to continue using the aluminum body panels, notwithstanding its knowledge of the Corrosion Defect, and its customers' lack of knowledge of such Defect has caused the Defect to go unremedied to this day.

54.    Further, although FCA knew the Corrosion Defect was unknown and not reasonably discoverable by Plaintiffs and Class members before they purchased or leased their Class Vehicles, at FCA's direction, its authorized employees and agents have concealed the Defect and denied that the Corrosion Defect even exists, including through utilization of standard answers developed by FCA to dispel expected consumer complaints.

## C.    The Class Plaintiffs' Experiences

55.    On or about February 2, 2019, Plaintiffs Domingo and Irma Orozco purchased their 2019 Jeep Wrangler from Hunting Jeep Chrysler Dodge Ram in Huntington, New York (for purposes of this section, the "Dealership"). While washing the Class Vehicle on or about February 4, 2019, the Orozcos noticed the Corrosion Defect on the Vehicle's tailgate. The same week, Mr. Orozco took the Class Vehicle to the Dealership, where Dealership personnel assessed the damage to the Class Vehicle and acknowledged the damage the Corrosion Defect had caused, agreeing to repaint the Vehicle under warranty. Mr. Orozco returned to the Dealership's body shop approximately two weeks later to pick up his Class Vehicle, but when he arrived at the Dealership, he noticed the repairs to his Vehicle had been

performed inadequately, as the paint on Plaintiffs' Class Vehicle was bubbling on its doors, fenders, and hinges.

56.     On or about June 21, 2018, Plaintiff Mark Bordelon purchased his 2018 Jeep Wrangler from Mark Dodge Chrysler Jeep Ram in Lake Charles, Louisiana (for purposes of this section, the "Dealership"). In or about February 2021, Mr. Bordelon noticed that the paint on his Class Vehicle's door hinge, frame, and rear window was bubbling and peeling. On or about February 15, 2021, Mr. Bordelon brought his Class Vehicle to the Dealership where Dealership personnel assessed bubbling paint that had resulted from the Corrosion Defect. After visually inspecting the door hinge, frame, and rear window on Mr. Bordelon's Class Vehicle, Dealership personnel took photographs of the Vehicle to document the damage caused by the Corrosion Defect. Dealership personnel then advised Mr. Bordelon that it would be contacting him with a plan of action. Mr. Bordelon returned with his Class Vehicle two months later, after he had not heard back from the Dealership. When he arrived, Dealership personnel advised Mr. Bordelon to take his Jeep vehicle to Martin GMC to get an estimate for the repair of the damage caused by the Corrosion Defect. Mr. Bordelon followed the Dealership's advice and brought his vehicle to Martin GMC, but, to date, has not received an estimate for the repairs.

57.     On or about May 9, 2020, Plaintiff Antoine Louvat purchased his 2020 Jeep Gladiator from Bournival Jeep in Portsmouth, New Hampshire (for purposes

of this section, the "Dealership"). In or about August 2020, Mr. Louvat noticed corrosion on the door hinges and other parts of his Class Vehicle. On or about November 30, 2020, Mr. Louvat brought his Class Vehicle to the Dealership where Dealership personnel assessed the corrosion on his Class Vehicle and said it was normal, providing no assistance or options to Mr. Louvat with regard to a potential repair for the Corrosion Defect.

58.     Prior to purchasing their Class Vehicle, Plaintiffs heard, viewed, and/or read FCA marketing materials that touted the quality, durability, and aesthetics of the Class Vehicles, and specifically the quality and benefits of the aluminum used on the Class Vehicles, and the sales representative and/or other personnel at the FCA authorized Dealerships also emphasized the quality, durability, and aesthetic features of the Class Vehicles. Plaintiffs had no way of knowing or learning that such information regarding the quality, durability, and aesthetics of the Class Vehicles, including the quality and benefits of the aluminum used on the Class Vehicles, conveyed to Plaintiffs in those commercials and by the sales representative and/or other Dealership personnel when deciding to purchase their Class Vehicles, was false.

59.     FCA failed to disclose the Corrosion Defect to Plaintiffs before they purchased the Class Vehicles, despite FCA's knowledge of the Corrosion Defect, and Plaintiffs, therefore, purchased the Class Vehicles on the reasonable, but

mistaken, belief that they would be high quality and durable vehicles that would retain their value. Plaintiffs would not have purchased the Class Vehicles, or would not have paid as much for them, had they known of the Corrosion Defect and the propensity of the Class Vehicles' aluminum panels, including their doors and door hinges, to prematurely corrode and their exterior paint to bubble and blister.

60.    Plaintiffs have suffered a concrete and ascertainable loss as a direct and proximate result of FCA's misconduct in that Plaintiffs overpaid for their Class Vehicles at the time of purchase, and the value of their Class Vehicles has been diminished as a result of the Corrosion Defect.

## D.    <u>**Applicable Warranties**</u>

71.    FCA sold the Class Vehicles with a Basic Limited Warranty ("BLW"), which provides bumper-to-bumper coverage for a period of 36 months or 36,000 miles, whichever occurs first.

72.    The BLW states:

> The Basic Limited Warranty covers the cost of all parts and labor needed to ***repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation***. There is no list of covered parts since the only exception are tires and Unwired headphones. ***You pay nothing for these repairs***. These warranty repairs or adjustments — including all parts and labor connected with them — will be made by an authorized dealer at no charge, using new or remanufactured parts.

73.    In addition, FCA sold the Class Vehicles with a Corrosion Warranty ("CW"), which provides coverage for corrosion to all "sheet metal panels" for a

period of 36 months, with no mileage limit. Recognizing the importance consumers placed on the exterior of their vehicles, the CW provided for extended warranty coverage of a period of 60 months for corrosion to "an outer-body sheet metal panel," which FCA defined as "one that is finish-painted and that someone can see when walking around the vehicle."

74.    The CW also states:

This warranty covers the cost of all parts and labor needed to repair or replace any sheet metal ***panels that get holes from rust or other corrosion***. If a hole occurs because of something other than corrosion, this warranty does not apply. Cosmetic or surface corrosion — resulting, for example, from stone chips or scratches in the paint — is not covered. For more details on what isn't covered by this warranty, see 3.5.

75.    While the CW appears to require that the Class Vehicles' aluminum panels be perforated from corrosion, the CW does not exclude coverage for "[c]osmetic or surface corrosion" resulting from a defect "in material, workmanship or factory preparation" – the type of corrosion at issue here – only such corrosion resulting from "stone chips or scratches in the paint." Nor does the CW exclude coverage for cosmetic or surface corrosion resulting from a FCA design and/or manufacturing defect in Section 3.5 of the CW, referenced above. Instead, Section 3.5 states:

Your warranties don't cover the following:

•   Corrosion caused by accident, damage, abuse, or vehicle alteration;

- Surface corrosion caused by such things as industrial fallout, sand, salt, hail, ocean spray, and stones;

- Corrosion caused by the extensive or abnormal transport of caustic materials like chemicals, acids, and fertilizers; and

- Corrosion of special bodies, body conversions, or equipment that was not on your vehicle when it left the manufacturing plant or was not supplied by FCA US.

76.     It is widely known throughout the automotive industry that aluminum body panels do not perforate from corrosion, and thus, FCA knew that customers who had purchased the Class Vehicles could never take advantage of the CW to the extent perforation of the panel was a requirement to obtain coverage. Accordingly, the extended warranty coverage provided by FCA for "an outer-body sheet metal panel" was, in and of itself, misleading, deceptive and, at best, illusory.

77.     However, instead of modifying the extended warranty so that customers could obtain coverage for the repairs necessitated by the Corrosion Defect, FCA concealed its inadequacy from consumers, and continued to provide them with its sham extended corrosion warranty. Because the CW appears to only apply if the body panel becomes perforated due to corrosion, and aluminum body panels cannot perforate from corrosion, the entirety of the CW is illusory.

78.     Moreover, to date, FCA has been unable to provide a permanent remedy that truly repairs the Corrosion Defect or prevents it from recurring. Accordingly, FCA's representations that it would "repair any item on your vehicle when it left the

manufacturing plant that is defective in material, workmanship or factory preparation" were materially false to the extent that it could not (and did not intend to) repair the Corrosion Defect as it was obligated to do under the CW.

E.     **The Agency Relationship Between FCA and Its Network of Authorized Dealerships**

79.     In order to sell vehicles to the general public, FCA enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new, FCA vehicles, including the Jeep-branded vehicles at issue here, the authorized dealerships are also permitted to service and repair these vehicles under the warranties FCA provides directly to consumers who purchased new vehicles from the authorized dealerships.

80.     Accordingly, FCA's authorized dealerships are FCA's agents, and the consumers who purchased or leased the Class Vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their Class Vehicles locally.

81.     Further, Plaintiffs and Class members are the intended beneficiaries of FCA's express warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under FCA's warranty agreements, which were designed for and intended to benefit the consumers only. Consumers, such as Plaintiffs and Class members, are the true intended beneficiaries

of FCA's express warranties and may, therefore, avail themselves of those warranties.

82.    FCA issued the express warranty to the Plaintiffs and Class members. FCA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. FCA also is responsible for the content of the Monroney Stickers on Jeep-branded vehicles. Because FCA issues the express warranty directly to the consumers, the consumers are in direct privity with FCA with respect to the warranties.

83.    In promoting, selling, and repairing its defective vehicles, FCA acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive FCA representatives and agents. That the dealers act as FCA's agents is demonstrated by the following facts:

a.    The authorized FCA US LLC dealerships complete all services and repairs according to FCA's instructions, which FCA issues to its authorized dealerships through service manuals, TSBs, technical tips, and other documents;

b.    Consumers are able to receive services under FCA's issued New Vehicle Limited Warranty only at FCA's authorized dealerships, and they are able to receive these services because of the agreements between FCA and the authorized dealers. These agreements provide FCA with a significant amount of control over the actions of the authorized dealerships;

c.      The warranties provided by FCA for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

d.      FCA dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

e.      FCA controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with FCA's authorization;

f.      FCA has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers' interaction with the public; and

g.      Defendant implemented its express warranties as they relate to the Defect alleged herein by instructing authorized FCA dealerships to address complaints of the Corrosion Defect by prescribing and implementing the relevant TSBs cited herein.

84.    Indeed, FCA's warranty booklets make it abundantly clear that FCA's authorized dealerships are FCA's agents for vehicle sales and service. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at its "authorized dealerships." For example, at the outset, FCA notifies Plaintiffs and Class members in the warranty booklet that "**[w]arranty service must be done by an authorized Chrysler,**

**Dodge, Jeep or Ram dealer**" and that "**[t]hey know you and your vehicle best, and are most concerned that you get prompt and high quality service**." Further, the booklets states that the "warranty problems can be resolved by an authorized dealer's sales or service departments." *Id*. The booklets further direct Plaintiffs and Class members, should they have a problem or concern, to "always talk to an authorized dealer's service manager or sales manager first." *Id*. FCA then directs Plaintiffs and Class members to first, "[d]iscuss your problem with the owner or general manager of the authorized dealership," and if that is unsatisfactory, to second, "contact the FCA US LLC Customer Assistance Center." *Id*.

85.    Accordingly, the authorized dealerships are agents of FCA. Plaintiffs and each of the Class members have had sufficient direct dealings with either FCA or its agent dealerships to establish privity of contract between FCA, on the one hand, and Plaintiffs and each Class member, on the other hand. This establishes privity with respect to the express warranty between Plaintiffs and Defendant.

**F.    FCA's Inadequate Remedy for the Corrosion Defect**

86.    As evidenced by the repair instructions in the five TSBs issued by FCA, repainting the Class Vehicles, even if done properly, does not cure the Corrosion Defect and does not remedy the diminution of value that occurs from repainting.

87.    For all the Class Vehicles, the factory paint was applied to exacting tolerances consistently over all aluminum panels, whereas the TSB repair process is

haphazard at best and results in paint inconsistencies relative to appearance and longevity. FCA knew the TSB repair procedures were inadequate at the time they were implemented, yet it concealed that fact from Plaintiffs and the Class members.

88.     Even if the Class Vehicles were properly repainted, their values would still be diminished, as repainted newer vehicles are worth less than vehicles with original paint. Indeed, there is a stigma associated with a repainted vehicle, and the fact that a vehicle has been repainted is often used by a potential buyer as a bargaining chip to lower the price.

89.     In addition, anticipated car purchasers often shy away from a vehicle that has been repainted, as it rings alarm bells that the vehicle may have been damaged in an accident and repainted as a result. A non-original paint job could also be an indication of major body repairs to a vehicle that are being hidden, not to mention rust.

90.     According to an online poll conducted by CarMax, 72% of respondents said that repainting the car is the strongest indicator of vehicle damage. In fact, CarMax states that repainting is one of the biggest warning signs indicating a vehicle may have been in a major accident, and instructs consumers to do the following to determine whether a used car may have been in a serious accident:

> Look for signs of repainting on the car, such as inconsistency in the paintwork or paint on the molding or gaskets. Run your finger along the inside of the door edge and see if the finish is smooth or rough. A rough finish can be caused by overspray during repainting. If signs of

repainting are found, ask additional questions to determine if the paintwork was for minor scratches and dents or to cover up more serious vehicle damage.

91.     Paint work to a vehicle typically shows up on a CARFAX Vehicle History Report, as such repairs are often reported by the dealerships or body shops performing them. Even if it is not, paint work can easily be identified through the use of a paint meter, which is used by dealers when evaluating vehicles for trade-in purposes. In the case of the Class Vehicles, given the nature of the Corrosion Defect and the inadequate repainting of the Vehicles, the paint work can be identified by potential buyers with the naked eye and without the use of a paint meter.

92.     CarMax's vehicle appraisals are determined, among other criteria, by its inspection of a "car's condition both inside and out," and it notes that "major defects" can impact their offers. CarMax significantly lowers the appraised values for vehicles, including Class Vehicles that have been repainted.

93.     Kelley Blue Book ("KBB") similarly bases its appraisals on the condition of the vehicle. KBB divides the condition of used vehicles into the following four grades:

> **Excellent** condition means that the ***vehicle looks new***, is in excellent mechanical condition and needs no reconditioning. ***This vehicle has never had any paint or body work*** and is free of rust. The vehicle has a clean Title History and will pass a smog and safety inspection. The engine compartment is clean, with no fluid leaks and is free of any wear or visible defects. The vehicle also has complete and verifiable service records. Less than 5 percent of all used vehicles fall into this category.

29

**Good** condition means that the vehicle is *free of any major defects*. This vehicle has a clean Title History, the paint, *body and interior have only minor (if any) blemishes*, and there are no major mechanical problems. There should be little or no rust on this vehicle. The tires match and have substantial tread wear left. A "good" vehicle will need some reconditioning to be sold at retail. Most consumer owned vehicles fall into this category.

**Fair** condition means that the *vehicle has some* mechanical or *cosmetic defects* and needs servicing but is still in reasonable running condition. This vehicle has a clean Title History, *the paint, body* and/or interior *need work performed by a professional*. The tires may need to be replaced. There may be some repairable rust damage.

**Poor** condition means that the *vehicle has severe* mechanical and/or *cosmetic defects* and is in poor running condition. The vehicle may have problems that cannot be readily fixed such as a damaged frame or a rusted-through body. A vehicle with a branded title (salvage, flood, etc.) or unsubstantiated mileage is considered "poor." A vehicle in poor condition may require an independent appraisal to determine its value.

## G.   The Damage Caused by the Corrosion Defect

94.    Plaintiffs and Class members purchased or leased the Class Vehicles based on their reasonable but mistaken belief that their Vehicles were of high quality, durable, and free of defects. However, the Class Vehicles delivered by FCA were not those for which Plaintiffs and Class members bargained. Rather, the Class Vehicles suffered from a common defect – the Corrosion Defect. Had Plaintiffs and Class members known of the Corrosion Defect, they would have either: (a) paid substantially less for the Class Vehicles; (b) required an immediate remedy that restored the Vehicles to the conditions bargained for; or (c) not purchased or leased the Class Vehicles.

95.     As a result of the disparity between the quality of the Class Vehicles negotiated for and the Vehicles actually received, Plaintiffs and Class members suffered economic harm. This economic harm can be quantified as: (a) the economic value of an effective remedy that restores the Class Vehicles to their expected conditions (or the economic harm from the lack of that remedy); (b) the discount that Plaintiffs and Class members would have required to accept the Vehicles in their actual condition; and/or (c) the diminished value of the Vehicles, both those that have been "sanded and repainted" and those that have not.

96.     Plaintiffs and Class members paid premiums to purchase and lease the Class Vehicles as a result of the brand, quality, durability, and value representations made by FCA. A vehicle purchased or leased with the reasonable expectation that it is of high quality and durable as advertised is worth more than a vehicle known to be subject to the problems or risks associated with the Corrosion Defect. Plaintiffs and Class members were harmed from the day they drove their Class Vehicles off the lot because they did not get what they paid for – a high-quality and durable vehicle that would retain its value under normal conditions.

97.     As a direct result of FCA's false and deceptive representations and omissions, Plaintiffs and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain. Plaintiffs and Class members paid a premium for the Class Vehicles, which FCA advertised as being durable and of high-quality,

and received Vehicles that contained a known but concealed defect. FCA profited because it obtained and retained monies paid by Plaintiffs and Class members who paid a price for the Class Vehicles that was higher than the value of the vehicles they received in return.

98.     It is inequitable and unjust for FCA to maintain the benefits of such revenue and profits derived directly from the Classes by way of their payments for their Class Vehicles.

99.     In addition, the widespread disclosure of the Corrosion Defect has caused a decrease in the value of the Class Vehicles, and, therefore, Plaintiffs and Class members have suffered a direct pecuniary loss in the form of the decreased value of their Vehicles, even when the Corrosion Defect has not yet manifested.

100.   As a result of FCA's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose the Corrosion Defect and the problems associated therewith, owners and lessees of the Class Vehicles have suffered losses in money and/or property.

## H.   Fraudulent Concealment Allegations

101.   Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at FCA responsible for disseminating false and deceptive marketing materials and

information regarding the Class Vehicles. FCA necessarily is in possession of, or has access to, all of this information.

102.   Plaintiffs' claims arise out of FCA's false, deceptive, and fraudulent concealment of the Corrosion Defect and the paint failures and premature rusting and corrosion it causes, and its representations about the quality, durability, and value of the Class Vehicles.

103.   To the extent that Plaintiffs' claims arise from FCA's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims. Plaintiffs allege that at all relevant times, including specifically at the time they purchased or leased their Class Vehicles, FCA knew, or was reckless in not knowing, of the Corrosion Defect; FCA was under a duty to disclose the Corrosion Defect based upon its exclusive knowledge of it, its affirmative representations about it, and its concealment of it, but FCA never disclosed the Corrosion Defect to Plaintiffs or the public at any time or place or in any manner.

104.   Plaintiffs make the following specific fraud allegations with as much specificity as possible, although they do not have access to information necessarily available only to FCA:

a.   ***Who***: FCA actively concealed the Corrosion Defect from Plaintiffs and Class members while simultaneously touting the quality and durability

of the Class Vehicles. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at FCA responsible for such decisions.

b.    ***What***: FCA knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Corrosion Defect. FCA concealed the Corrosion Defect and made contrary representations about the quality and durability, and other attributes of the Class Vehicles.

c.    ***When***: FCA concealed material information regarding the Corrosion Defect at all times and made representations about the quality and durability of the Class Vehicles, starting no later than 2004, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day. FCA has not disclosed the truth about the Corrosion Defect in the Class Vehicles to anyone outside of FCA. FCA has never taken any action to inform consumers about the true nature of the Corrosion Defect in Class Vehicles. Additionally, when consumers brought their Class Vehicles to FCA complaining of the paint peeling, flaking, bubbling off, corroding, or rusting off their Vehicles, FCA denied any knowledge of, or responsibility for, the Corrosion Defect, and in many instances, blamed owners/lessees for causing the problem.

d. ***Where***: FCA concealed material information regarding the true nature of the Corrosion Defect in the communications it had with Plaintiffs and Class members and made contrary representations about the quality and durability of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing in which FCA disclosed the truth about the Corrosion Defect in the Class Vehicles to anyone outside of FCA. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on FCA's website.

e. ***How***: FCA concealed the Corrosion Defect from Plaintiffs and Class members and made representations about the quality and durability of the Class Vehicles. FCA actively concealed the truth about the existence and nature of the Corrosion Defect from Plaintiffs and Class members, at all times, even though it knew about the Corrosion Defect and knew that information about the Corrosion Defect would be important to a reasonable consumer. FCA also promised in its marketing materials that the Class Vehicles have qualities that they do not have, and moreover, made representations in its warranties that it knew were false, misleading, and deceptive.

f. ***Why***: FCA actively concealed material information about the Corrosion Defect in Class Vehicles for the purpose of inducing Plaintiffs and Class members to purchase or lease the Vehicles, rather than purchasing or leasing

competitors' vehicles and made representations about the quality and durability of the Vehicles. Had FCA disclosed the truth, for example, in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers, including Class members) would have been aware of it, and they would not have bought the Class Vehicles or would have paid less for them.

I. **Tolling of the Statute of Limitations**

*Fraudulent Concealment Tolling*

105. FCA has known of the Corrosion Defect in the Class Vehicles since at least 2004, and has concealed from, or failed to, notify Plaintiffs, Class members, and the public of the full and complete nature of the Corrosion Defect, even when directly asked about it by Plaintiffs and Class members during communications with FCA, FCA Customer Assistance, FCA dealerships, and FCA service centers. FCA continues to conceal the Corrosion Defect to this day.

106. Any applicable statute of limitation has, thus, been tolled by FCA's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

*Estoppel*

107. FCA was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles. FCA actively concealed – and continues to conceal – the true character, quality, and nature

of the Class Vehicles and knowingly made representations about the quality and durability of the Vehicles. Plaintiffs and Class members reasonably relied upon FCA's knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing, FCA is estopped from relying on any statutes of limitation in defense of this action.

### *Discovery Rule*

108.  Certain causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their Class Vehicles contained the Corrosion Defect.

109.  However, Plaintiffs and Class members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after the Corrosion Defect caused the paint on their Class Vehicles to peel, flake, bubble, corrode, or rust.

110.  Even then, Plaintiffs and Class members had no reason to know the peeling, flaking, bubbling, corrosion, or rusting were caused by a defect in the Class Vehicles because of FCA's active concealment of the Corrosion Defect. Not only did FCA fail to notify Plaintiffs or Class members about the Corrosion Defect, FCA, in fact, denied any knowledge of, or responsibility for, the Defect when directly asked about it, and, in many instances, actually blamed the owner/lessee for causing the problem.

111.   Thus, Plaintiffs and Class members were not reasonably able to discover the Corrosion Defect until after they had purchased or leased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest, they discovered that the Defect was causing paint failures and premature corrosion on their Vehicles.

## V.   CLASS ALLEGATIONS

112.   Plaintiffs bring this action pursuant to Rule 23(a) and (b)(2)-(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated as members of the following Nationwide Class (under the laws of the state of Michigan) and State Classes defined as:

**Nationwide Class:**

All persons or entities in the United States (including its territories and the District of Columbia) that purchased or leased a Class Vehicle. Class Vehicles consist of Jeep Wranglers, model years 2018-2021, and Jeep Gladiators, model years 2020-2021.

**Louisiana Class:**

All persons or entities that purchased or leased a Class Vehicle in the state of Louisiana.

**New Hampshire Class:**

All persons or entities that purchased or leased a Class Vehicle in the state of New Hampshire.

**New York Class:**

All persons or entities that purchased or leased a Class Vehicle in the state of New York.

113.   Excluded from the Class are FCA; its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of FCA; FCA's dealers; Class Counsel and their employees; the judicial officers and their immediate family members and associated court staff assigned to this case; and all persons within the third degree of relationship to any such persons.

114.   Certification of Plaintiffs' claims for Class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

115.   This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Fed. R. Civ. P. 23.

116.   **Numerosity**. Rule 23(a)(1) of the Federal Rules of Civil Procedure: The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are at least thousands of Class members, the precise number of Class members is unknown to Plaintiffs but may be ascertained from FCA's books and records. Class members may be notified of the pendency of this

action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

117. **Commonality and Predominance**. Rules 23(a)(2) and (b)(3) of the Federal Rules of Civil Procedure: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to:

      a.    whether FCA engaged in the conduct alleged herein;

      b.    whether FCA designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

      c.    whether FCA designed, manufactured, marketed, and distributed Class Vehicles with a Corrosion Defect;

      d.    whether Plaintiffs and Class members overpaid for their Class Vehicles and/or did not receive the benefit of the bargain;

      e.    whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, in what amount;

      f.    whether FCA's alleged conduct constitutes the use or employment of an unconscionable commercial practice, deception, fraudulent concealment, false pretense, false promise, and misrepresentation within the meaning of the applicable state consumer fraud statutes;

g.       whether FCA has violated its express warranties to Plaintiffs and Class members;

h.       whether FCA has been unjustly enriched so that its receipt and retention of the profits derived from Plaintiffs and Class members is inequitable;

i.       whether FCA actively concealed the Corrosion Defect in order to maximize profits to the detriment of Plaintiffs and Class members; and

j.       such other common factual and legal issues as are apparent from the allegations and causes of action asserted in this Complaint.

118.   **Typicality**. Rule 23(a)(3) of the Federal Rules of Civil Procedure: Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through FCA's wrongful conduct as described above. All claims seek recovery on the same legal theories and are based upon FCA's common course of conduct.

119.   **Adequacy**. Rule 23(a)(4) of the Federal Rules of Civil Procedure: Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class' interests will be fairly and adequately protected by Plaintiffs and their counsel.

120. **Declaratory Relief**. Rule 23(b)(2) of the Federal Rules of Civil Procedure: FCA has acted or refused to act on grounds generally applicable to Plaintiffs and Class members, thereby making appropriate declaratory relief, with respect to each Class as a whole.

121. **Superiority**. Rule 23(b)(3) of the Federal Rules of Civil Procedure: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for Class members to individually seek redress for FCA's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

# VI.   CLAIMS

## A.   Claims Brought on Behalf of the Nationwide Class

### NATIONWIDE COUNT I
### UNJUST ENRICHMENT

122.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

123.   Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class under the common law of unjust enrichment, which is materially uniform in all states.

124.   Plaintiffs bring this claim as an alternative to the contractual warranty claims asserted below and in the event that Plaintiffs prevail on their claims that any contract with FCA (including any express warranty) was a result of FCA's falsehoods and deception, was illusory since, in reality, the warranties offered no coverage for the Corrosion Defect, and/or if Plaintiffs prevail in proving that the warranties cannot be enforced by FCA due to FCA having provided the warranties only after entering into a contract with a purchaser or lessor, or due to FCA's intentional and deceptive efforts to conceal the Corrosion Defect and avoid its warranty obligations.

125.   Plaintiffs and the members of the Nationwide Class directly conferred a benefit on FCA in the form of their payments for their Class Vehicles, and FCA has received millions in revenue from the sale of the Class Vehicles since 2017 and

continues to receive millions in revenue from the sale of the Class Vehicles to this day. In so doing, FCA has disregarded the rights of Plaintiffs and members of the Nationwide Class.

126. Further, this revenue was a benefit conferred upon FCA by Plaintiffs and Class members, individuals living across the United States, and FCA's acceptance and retention of such benefits under circumstances, as here, is inequitable.

127. FCA manufactured, marketed, and sold defective Class Vehicles to Plaintiffs and Class members, while actively concealing the Class Vehicles' known defects and touting the durability and quality of the Class Vehicles, including the quality and benefits of the aluminum used on the Class Vehicles.

128. FCA benefitted from selling defective Class Vehicles for more money than they were worth, at a profit, and Plaintiffs have overpaid for the Class Vehicles and, in some instances, been forced to pay to (unsuccessfully) repair the Corrosion Defect.

129. Plaintiffs and Class members elected to purchase or lease the Class Vehicles based on FCA's false and deceptive representations. FCA knew and understood that it would (and did) receive a financial benefit, and voluntarily accepted the same from Plaintiffs and Class members when they elected to purchase or lease the Class Vehicles.

130. The Class Vehicles' defect, and FCA's concealment of the same, enriched FCA beyond its legal rights by securing through deceit, falsehoods, and omissions millions of dollars in revenues since 2017.

131. Therefore, because FCA will be unjustly enriched if it is allowed to retain the revenues obtained through falsehoods, deception, and omissions, Plaintiffs and each Class member are entitled to recover the amount by which FCA was unjustly enriched at his or her expense.

132. Accordingly, Plaintiffs, on behalf of themselves and each Class member, seek damages against FCA in the amounts by which it has been unjustly enriched at Plaintiffs' and each Class member's expense. Plaintiffs also respectfully request this Honorable Court to enter judgment in favor of the Plaintiffs and the Nationwide Class on account of FCA's unjust enrichment and compel FCA to disgorge in a common fund for the benefit of Plaintiffs and Nationwide Class members all wrongful or inequitable proceeds it received. A constructive trust should be imposed upon all wrongful or inequitable sums received by FCA traceable to Plaintiffs and the members of the Nationwide Class.

## NATIONWIDE COUNT II
## BREACH OF EXPRESS WARRANTY

133. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

134.   Plaintiffs, on behalf of themselves and Nationwide Class members, assert a claim for breach of express warranty under the UCC.

135.   FCA marketed and sold FCA automobiles into the stream of commerce with the intent that the automobiles would be purchased by Plaintiffs and Nationwide Class members.

136.   FCA expressly warranted that certain automobiles, including the Class Vehicles' aluminum panels used were durable and of high quality, and would positively impact the attributes of the Class Vehicles, and certainly not that the aluminum used on the Class Vehicles would cause its body panels to corrode and clearcoat to peel, flake, or bubble under normal conditions, and cause other problems that would negatively impact the value of the Class Vehicles. FCA's warranties were express warranties, which became part of the basis of the bargain Plaintiffs and Nationwide Classes members entered into when they purchased the Class Vehicles from FCA and/or FCA authorized dealerships.

137.   FCA breached its express warranties to Plaintiffs and the Nationwide Class because the Class Vehicles' aluminum panels were, in fact, not durable and of high quality, and would not positively impact the attributes of the Class Vehicles.

138.   As a result of FCA's breach of its express warranties, Plaintiffs and the Nationwide Class have suffered actual damages in that they have purchased products that are less valuable than the automobiles would have been had FCA's

46

representations been true, and Plaintiffs and the Nationwide Class paid prices for their automobiles that were higher than they would have paid had FCA accurately represented the safety ratings of the Class Vehicles.

139.   Plaintiffs respectfully request this Honorable Court to enter judgment in favor of the Plaintiffs and the Nationwide Class on account of FCA's breach of express warranties to the Plaintiffs and the Nationwide Class and to order rescission of the Class Vehicles sales at issue or, in the alternative, award Plaintiffs and Nationwide Class members the actual damages they have suffered as a result of FCA's breach of its express warranties.

## NATIONWIDE COUNT III
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
## (15 U.S.C. §2301, *et seq.*)

140.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

141.   This Court has jurisdiction to decide claims brought under the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq*. ("MMWA") by virtue of 28 U.S.C. §1332(a)-(d).

142.   The Class Vehicles are "consumer products" within the meaning of the MMWA, 15 U.S.C. §2301(1).

143.   Plaintiffs are "consumers" within the meaning of the MMWA, 15 U.S.C. §2301(3). They are consumers because they are persons entitled under

applicable state law to enforce against the warrantor the obligations of its written warranties.

144. FCA is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. §2301(4)-(5).

145. 15 U.S.C. §2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

146. In connection with the purchase or lease of all Class Vehicles, and as detailed above, FCA provided Plaintiffs and Class members with a warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, and an extended warranty covering corrosion damage relating to such defects for a period of two additional years, both of which are covered under 15 U.S.C. §2301(6).

147. FCA breached its warranties, as described in more detail above, and is therefore liable to Plaintiffs and Class members pursuant to 15 U.S.C. §2310(d)(1). Without limitation, the Class Vehicles share a common design and/or manufacturing defect in that the Class Vehicles are defectively designed and built with a propensity to cause their body to prematurely corrode and their exterior paint to bubble, flake, peel, and/or rust. Through its partial practice of covering the cost of having the Class Vehicles sanded and repainted, FCA has tacitly admitted that the Class Vehicles suffer from a Corrosion Defect of its own making, but FCA's refusal to fully cover

repairs and acknowledge the Corrosion Defect in order to inform current and future purchasers and lessors of Class Vehicles is woefully insufficient.

148.   In its capacity as a warrantor, FCA had knowledge of the inherent defect in the Class Vehicles. Any effort by FCA to limit any aspect of its warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

149.   Any limitations FCA might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between FCA and Plaintiffs and Class members, as, at the time of purchase and lease, Plaintiffs and Class members had no other options for purchasing warranty coverage other than directly from FCA.

150.   Any limitations FCA might seek to impose on its warranties are substantively unconscionable. FCA knew that the Class Vehicles were defective and would continue to pose infrastructure and quality concerns after the warranties purportedly expired. FCA failed to disclose these defects to Plaintiffs and Class members. Thus, FCA's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

151.   Plaintiffs and each of the other Class members have had sufficient direct dealings with either FCA or its agents (dealerships) to establish privity of

contract between FCA, on the one hand, and Plaintiffs and each of the other Class members, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for, and intended to, benefit consumers.

152.   Pursuant to 15 U.S.C. §2310(e), Plaintiffs are entitled to bring this class action and are not required to give FCA notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Fed. R. Civ. P. 23.

153.   Plaintiffs and Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and Class members have not reaccepted their Class Vehicles by retaining them.

154.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class

members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. §2310(d)(2), Plaintiffs and Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and Class members in connection with the commencement and prosecution of this action.

155. Plaintiffs seek the establishment of an FCA-funded program for Plaintiffs and Class members to recover out-of-pocket costs incurred in attempting to rectify the Corrosion Defect in their Class Vehicles.

**B.**   **Claims Brought on Behalf of the New York Class**

**NEW YORK COUNT I**
**DECEPTIVE ACTS OR PRACTICES IN VIOLATION OF N.Y. LAW**
**(N.Y. GEN. BUS. LAW §349)**

156. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

157. Plaintiffs Domingo and Irma Orozco (for the purposes of this section, "Plaintiffs") brings this claim on behalf of themselves and the New York Class.

158. Plaintiffs and the New York Class members are "persons" within the meaning of New York General Business Law ("New York GBL"), N.Y. GEN. BUS.

LAW §349(h). FCA is a "person," "firm," "corporation," or "association" within the meaning of N.Y. GEN. BUS. LAW §349.

159.  The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW §349.

160.  In the course of its business, FCA violated the New York GBL by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality of the Class Vehicles, the quality and benefits of the aluminum panels used on the Class Vehicles, the existence of the Corrosion Defect, the existence of a repair for the Corrosion Defect, and FCA's ability and intention to render such a repair.

161.  Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, FCA engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the New York GBL:

> (a)  representing that the Class Vehicles have characteristics or benefits that they do not have;
>
> (b)  representing that the Class Vehicles are of a particular standard and quality when they are not;
>
> (c)  advertising the Class Vehicles with the intent not to sell them as advertised;

(d)    failing to state a material fact if the failure deceives or tends to deceive; and/or

(e)    knowingly concealing, suppressing, or omitting any material fact with the intent that a consumer rely on the same.

162.    FCA's scheme and concealment of the true characteristics of the Class Vehicles were material to the New York Class, and FCA misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the New York Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiffs and the New York Class members would not have purchased or leased the Class Vehicles or would have paid significantly less for them.

163.    Plaintiffs and the New York Class members had no way of discerning that FCA's representations were false and misleading, or otherwise learning the facts that FCA had concealed or failed to disclose.

164.    FCA had an ongoing duty to Plaintiffs and the New York Class members to refrain from unfair and deceptive practices under the New York GBL in the course of its business. Specifically, FCA owed Plaintiffs and the New York Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiffs and the New York Class members, and/or it made

misrepresentations that were rendered misleading because they were contradicted by withheld facts.

165.   Plaintiffs and the New York Class members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

166.   Pursuant to N.Y. GEN. BUS. LAW §349, Plaintiffs and the New York Class members seek an order awarding damages, treble damages, and any other just and proper relief available under the New York GBL.

**NEW YORK COUNT II**
**VIOLATION OF THE NEW YORK FALSE ADVERTISING ACT**
**(N.Y. GEN. BUS. LAW §350)**

167.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

168.   Plaintiffs Domingo and Irma Orozco (for the purposes of this section, "Plaintiffs") bring this claim on behalf of themselves and the New York Class.

169.   FCA was engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. GEN. BUS. LAW §350.

170.   N.Y. GEN. BUS. LAW §350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails

to reveal facts material in light of . . . representations [made] with respect to the commodity. . ." N.Y. GEN. BUS. LAW §350-a.

171.  FCA caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known, to FCA to be untrue and misleading to consumers including Plaintiffs and the New York Class members.

172.  FCA violated N.Y. GEN. BUS. LAW §350 because the misrepresentations and omissions regarding the quality of the Class Vehicles and the quality and benefits of the aluminum used on the Class Vehicles were material and likely to deceive a reasonable consumer. FCA also violated N.Y. GEN. BUS. LAW §350 because the misrepresentations and omissions regarding the existence of a repair for the Corrosion Defect and FCA's ability and intention to render such a repair were material and likely to deceive a reasonable consumer.

173.  Plaintiffs and the New York Class members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

174.  Pursuant to N.Y. GEN. BUS. LAW §350-e, Plaintiffs and the New York Class members seek monetary relief against FCA measured as the greater of: (a) actual damages in an amount to be determined at trial; and (b) statutory damages in

the amount of $500 for each of Plaintiffs and the New York Class members.  Because

FCA's conduct was committed willfully and knowingly, Plaintiffs and the New York

Class members are entitled to recover three times actual damages, up to $10,000

each.

## NEW YORK COUNT III
## BREACH OF EXPRESS WARRANTY
## (N.Y. U.C.C. LAW §§2-313 AND 2A-210)

175.   Plaintiffs reallege and incorporate by reference all preceding

allegations as though fully set forth herein.

176.   Plaintiffs Domingo and Irma Orozco (for the purposes of this section,

"Plaintiffs") bring this claim on behalf of themselves and the New York Class.

177.   FCA is and was at all relevant times a "merchant" with respect to the

Class Vehicles under N.Y. U.C.C. LAW §2-104(1), and a "seller" of the Class

Vehicles under §2-103(1)(d).

178.   With respect to leases, FCA is and was at all relevant times a "lessor"

of motor vehicles under N.Y. U.C.C. LAW §2A-103(1)(p).

179.   The Class Vehicles are and were at all relevant times "goods" within

the meaning of N.Y. U.C.C. LAW §§2-105(1) and 2A-103(1)(h).

180.   In connection with the purchase or lease of all Class Vehicles, and as

detailed above, FCA provided Plaintiffs and the New York Class members with a

warranty covering defects in materials and workmanship of the Class Vehicles for

three years or 36,000 miles, and an extended warranty covering corrosion damage relating to such defects for a period of two additional years.

181.  FCA's warranties formed a basis of the bargain that was reached when Plaintiffs and the New York Class members purchased or leased their Class Vehicles.

182.  FCA breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiffs and the New York Class members with Class Vehicles containing defects in the materials and workmanship that were never disclosed to Plaintiffs and the New York Class members; (b) failing to repair or replace the Class Vehicles at no cost within the warranty periods; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by FCA.

183.  Plaintiffs and the New York Class members have given FCA a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by FCA can neither cure the defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

184.   Thus, FCA's warranties fail of their essential purpose, and the recovery of Plaintiffs and the New York Class members is not limited to their remedies.

185.   Accordingly, Plaintiffs and the New York Class members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the New York Class members of the purchase or lease price of all Class Vehicles currently owned and leased, and for such other incidental and consequential damages as allowed.

186.   As a direct and proximate result of FCA's breach of express warranty, Plaintiffs and the New York Class members have been damaged in an amount to be determined at trial.

187.   FCA was provided notice of the issues raised in this Count and this Complaint, as detailed above.

**C.**   **Claims Brought on Behalf of the Louisiana Class**

**LOUISIANA COUNT I**
**VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES**
**AND CONSUMER PROTECTION LAW**
**(LA. REV. STAT. § 51:1401, *et seq*.)**

188.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

189.   Plaintiff Mark Bordelon (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the Louisiana Class.

190.   FCA, Plaintiff, and the Louisiana Class are "persons" within the meaning of the LA. REV. STAT. § 51:1402(8).

191.   Plaintiff and the Louisiana Class are "consumers" within the meaning of LA. REV. STAT. § 51:1402(1).

192.   FCA engaged in "trade" or "commerce" within the meaning of LA. REV. STAT. § 51:1402(10).

193.   The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." LA. REV. STAT. § 51:1405(A).

194.   In the course of its business, FCA violated the Louisiana CPL by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality and benefits of the aluminum used on the Class Vehicles, the existence of the Corrosion Defect, and FCA's ability to render an adequate repair for the Corrosion Defect.

195.   Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, FCA engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the proscribed by the Louisiana CPL:

> (a)    causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

(b)     representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

(c)     representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

(d)     advertising the Class Vehicles with the intent not to sell or lease them as advertised;

(e)     engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

(f)     Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

196. FCA's scheme and concealment of the true characteristics of the Class Vehicles were material to the Louisiana Class, and FCA misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Louisiana Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Louisiana Class members would not have

purchased or leased the Class Vehicles, or would have paid significantly less for them.

197.   Plaintiff and the Louisiana Class members had no way of discerning that FCA's representations were false and misleading, or otherwise learning the facts that FCA had concealed or failed to disclose.

198.   FCA had an ongoing duty to Plaintiff and the Louisiana Class members to refrain from unfair and deceptive practices under the Louisiana CPL in the course of its business. Specifically, FCA owed Plaintiff and the Louisiana Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Louisiana Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

199.   Plaintiff and the Louisiana Class members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

200.   FCA's violations present a continuing risk to Plaintiff and the Louisiana State Class, as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

201.   Pursuant to LA. REV. STAT. § 51:1409, Plaintiff and the Louisiana State Class seek an order enjoining FCA's unfair and/or deceptive acts or practices, and

awarding damages, punitive damages, and any other just and proper relief available under the Louisiana CPL.

## LOUISIANA COUNT II
## BREACH OF WARRANTY AGAINST REDHIBITORY DEFECTS
## (LA. CIV. CODE ART. 2520, 2524)

202.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

203.   Plaintiff Mark Bordelon (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the Louisiana Class.

249.   FCA is and was at all relevant times a "seller" with respect to motor vehicle sales under LA. CIV. CODE Arts. 2520, 2524.

250.   A warranty that the Class Vehicles were free from redhibitory defects is implied by law pursuant to LA. CIV. CODE Arts. 2520, 2524.

251.   The Class Vehicles, when sold or leased and at all times thereafter, were not free from redhibitory defects as a result of the Corrosion Defect. In addition, because any warranty repairs or replacements offered by FCA cannot cure the Corrosion Defect in the Class Vehicles, such warranty fails to cure FCA's breach of warranty against redhibitory defects.

252.   As a direct and proximate result of FCA's breach of the warranty against redhibitory defects, the Louisiana Class members have been damaged in an amount to be proven at trial.

253.   FCA was provided notice of the issues raised in this Count and this Complaint, as detailed above.

**D.   Claims Brought on Behalf of the New Hampshire Class**

### NEW HAMPSHIRE COUNT I
### VIOLATION OF N.H. CONSUMER PROTECTION ACT
### (N.H. Rev. Stat. Ann. § 358-a:1, *et seq.*)

204.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

205.   Plaintiff Antoine Louvat (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the New Hampshire Class.

206.   FCA and the New Hampshire Class members are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. REV. STAT. ANN. §358-A:1(I). FCA's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. REV. STAT. ANN. §358-A:1(II).

207.   The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: … [r]epresenting that goods or services have … characteristics, … uses, benefits, or quantities that they do not have; … [r]epresenting that goods or services are of a particular standard, quality, or grade, … if they are of another; … [and] [] [a]dvertising goods or services with intent not to sell them as advertised."  N.H. REV. STAT. ANN. §358A:2(V), (VII), and (IX).

208.   In the course of its business, FCA violated the New Hampshire CPA by knowingly misrepresenting and intentionally concealing material facts regarding quality of the Class Vehicles, the quality and benefits of the aluminum parts used on the Class Vehicles, the existence of a repair for the Corrosion Defect, and FCA's ability and intention to render such a repair.

209.   Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, FCA engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the New Hampshire CPA:

(a)     representing that the Class Vehicles have characteristics or benefits that they do not have;

(b)     representing that the Class Vehicles are of a particular standard and quality when they are not; and/or

(c)     advertising the Class Vehicles with the intent not to sell them as advertised.

210.   FCA's scheme and concealment of the true characteristics of the Class Vehicles were material to the New Hampshire Class members, and FCA misrepresented, concealed, or failed to disclose the truth with the intention that the New Hampshire Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, the New Hampshire Class

members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

211.   The New Hampshire Class members had no way of discerning that FCA's representations were false and misleading, or otherwise learning the facts that FCA had concealed or failed to disclose.

212.   FCA had an ongoing duty to the New Hampshire Class members to refrain from unfair and deceptive practices under the New Hampshire CPA in the course of its business. Specifically, FCA owed the New Hampshire Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the New Hampshire Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

213.   The New Hampshire Class members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

214.   Pursuant to N.H. REV. STAT. ANN. §358A:10, the New Hampshire Class members seek an order awarding damages, treble damages, and any other just and proper relief available under the New Hampshire CPA.

## NEW HAMPSHIRE COUNT II
## BREACH OF EXPRESS WARRANTY
## (N.H. REV. STAT. ANN. §§382-A:2-313 AND 382-A:2A-210)

215.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

216.   Plaintiff Antoine Louvat (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the New Hampshire Class.

217.   FCA is and was at all relevant times a "merchant" with respect to the Class Vehicles under N.H. REV. STAT. ANN. §382-A:2-104(1), and a "seller" of the Class Vehicles under §382-A:2-103(1)(d).

218.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.H. REV. STAT. ANN. §382-A:2A-103(1)(p).

219.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. REV. STAT. ANN. §§382-A:2-105(1) and 382-A:2A-103(1)(h).

220.   In connection with the purchase or lease of all Class Vehicles, and as detailed above, FCA provided Plaintiff and the New Hampshire Class members with a warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, and an extended warranty covering corrosion damage relating to such defects for a period of two additional years.

221.   FCA's warranties formed a basis of the bargain that was reached when Plaintiff and the New Hampshire Class members purchased or leased their Class Vehicles.

222.   FCA breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiff and the New Hampshire Class members with Class Vehicles containing defects in the materials and workmanship that were never disclosed to Plaintiff and the New Hampshire Class members; (b) failing to repair or replace the Class Vehicles at no cost within the warranty periods; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by FCA.

223.   Plaintiff and the New Hampshire Class members have given FCA a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by FCA can neither cure the defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

224.   Thus, FCA's warranties fail of their essential purpose, and the recovery of Plaintiff and the New Hampshire Class members is not limited to their remedies.

225.   Accordingly, Plaintiff and the New Hampshire Class members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the New Hampshire Class members of the purchase or lease price of all Class Vehicles currently owned and leased, and for such other incidental and consequential damages as allowed.

226.   As a direct and proximate result of FCA's breach of its express warranty, Plaintiff and the New Hampshire Class members have been damaged in an amount to be determined at trial.

227.   FCA was provided notice of the issues raised in this Count and this Complaint, as detailed above.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the members of the State Classes, respectfully request that the Court certify the proposed State Classes, including designating the named Plaintiffs as representatives of their respective State Classes and appointing the undersigned as Class Counsel, and the designation of any appropriate issue classes, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in Plaintiffs' favor and against FCA including the following relief:

(i)      A declaration that any applicable statutes of limitations are tolled due to FCA's fraudulent concealment and that FCA is estopped from relying on any statutes of limitations in defense;

(ii)      Restitution, compensatory damages, and costs for economic loss and out-of- pocket costs;

(iii)      Punitive and exemplary damages under applicable law;

(iv)      Reimbursement and compensation of the full purchase price for any repairs or replacements purchased by a Plaintiff or Class member to remedy the Corrosion Defect;

(v)      A determination that FCA is financially responsible for all Class notices and the administration of Class relief;

(vi)      Any applicable statutory or civil penalties;

(vii)      An order requiring FCA to pay both pre-judgment and post-judgment interest on any amounts awarded;

(viii)      An award of reasonable counsel fees, plus reimbursement of reasonable costs, expenses, and disbursements, including reasonable allowances for the fees of experts;

(ix)      Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

(x)     Any such other and further relief the Court deems just and equitable.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiffs and Class members hereby demand a trial by jury, pursuant to Fed. R. Civ. P. 38(b), of all issues so triable.

Dated: December 3, 2021.          Respectfully submitted,

**KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT**

By */s/ Jason H. Alperstein*
   Jason H. Alperstein
   Kristen Lake Cardoso
   1 West Las Olas Boulevard, Suite 500
   Fort Lauderdale, FL 33301
   Telephone:  (954) 525-4100
   Facsimile:  (954) 525-4300
   E-mail:   alperstein@kolawyers.com
           cardoso@kolawyers.com

   Steven G. Calamusa
   Geoff S. Stahl
   Rachel A. Bentley
   **GORDON & PARTNERS, P.A.**
   4114 Northlake Boulevard
   Palm Beach Gardens, FL 33410
   Telephone: (561) 799-5070
   Facsimile: (561) 799-4050
   E-mail:   scalamusa@fortheinjured.com
           gstahl@fortheinjured.com
           rbentley@fortheinjured.com

   *Counsel for Plaintiffs and the Proposed Class*