## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| DOMINGO OROZCO, IRMA OROZCO, MARK BORDELON, and ANTOINE LOUVAT, individually and on behalf of all others similarly situated,<br><br>                            Plaintiffs,<br><br>   vs.<br><br>FCA US, LLC,<br><br>                         Defendant. | Case No. 4:21-cv-12823-MFL-DRG<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

     Plaintiffs Connie Lewis, Domingo Orozco, Irma Orozco, Christopher Carano, Mark Bordelon, Antoine Louvat, Justin Navin, Raynell McDaniel, Richard Alvater, and Jose Gomez (together, "Plaintiffs") bring this action on behalf of themselves and all other similarly situated members of the below-defined classes (collectively, the "Class") against Defendant FCA US, LLC ("FCA" or "Defendant"), and allege the following based upon information and belief, the investigation of counsel, and personal knowledge as to the factual allegations pertaining to themselves.

## I.    <u>INTRODUCTION</u>

     1.    This action arises from the false and deceptive representations made by FCA to the owners and lessees of its 2018-2021 Jeep Wrangler and 2020-2021 Jeep

Gladiator off-road vehicles (the "Class Vehicles" or "Vehicles") regarding specific components of the Vehicles that have been featured prominently and repeatedly by FCA in its marketing and advertising campaigns, designed to maximize sales.

2. As detailed below, FCA made affirmative representations to Plaintiffs and Class members in its marketing materials regarding the aluminum body panels and parts incorporated into the all-new Jeep Wrangler and Gladiator Class Vehicles and, specifically, promoted the quality and benefits of the aluminum used on the Vehicles, when, in reality, the Class Vehicles' aluminum panels corrode and the exterior paint on its aluminum body parts bubble, flake, peel, rust and/or blister (the "Corrosion Defect" or "Defect"), due to a latent defect that manifests itself over time and exists in each Class Vehicle at the time it leaves FCA's possession and control.

3. Plaintiffs had no way of discerning or otherwise learning facts to reveal that FCA's representations pertaining to the Class Vehicles were false and misleading, as FCA failed to disclose and knowingly concealed the Corrosion Defect from Plaintiffs (and Class members) in its marketing materials. It was only after Plaintiffs had purchased their Class Vehicles that FCA's incomplete marketing, which omitted reference to the Corrosion Defect, was revealed.

4. Neither FCA, nor its authorized dealers—who were advised of the Corrosion Defect and provided with repair instructions (albeit inadequate) in technical service bulletins ("TSBs") issued by FCA starting soon after the first model

year Class Vehicle (*i.e.*, the 2018 Wrangler) was released to the public—acknowledge the Corrosion Defect in response to Class member inquiries. As alleged in more detail below, Class members who present their Vehicles to authorized, FCA dealers for repairs—as directed by FCA—have learned that the repair provided, even if done properly, does not cure the Corrosion Defect, and if the parts are replaced, the replacement parts have the same Corrosion Defect. Moreover, FCA's remedy neither compensates Class members for the diminution of value that occurs to their Class Vehicles when there is, *inter alia*, sanding and grinding done to the aluminum when repainting occurs pursuant to the TSBs, or for other damages, such as out of pocket expenses incurred as a result of the Corrosion Defect. Further, Class Vehicles are worth less after the failed attempt at repairs than before the "repairs" that are completed at the direction of FCA.

5.     Plaintiffs and Class members have suffered ascertainable losses and actual damages as a direct and proximate result of FCA's misrepresentations and omission of the Corrosion Defect in that they: (1) overpaid for the Class Vehicles because the Defect significantly diminishes the value of the Vehicles; (2) have Vehicles that suffer premature corrosion and unsightly paint failures; and (3) must expend significant money to have their Vehicles (inadequately) repaired and repainted, or for a replacement part that has the same Corrosion Defect.

6.     Plaintiffs and Class members have purchased and leased Class Vehicles that they would not otherwise have purchased or leased, or would have paid less for, had they known of the Corrosion Defect at the point of sale.

7.     Accordingly, Plaintiffs bring claims for (1) unjust enrichment and (2) violations of the consumer protection laws of the states of Michigan, New York, Louisiana, New Hampshire, Florida, Illinois, Minnesota, and Maryland *or* New Jersey.

## II.     THE PARTIES

8.     Plaintiff Connie Lewis is a citizen of Michigan, residing in Cedar Springs, Michigan. Ms. Lewis purchased a new 2018 Jeep Wrangler for personal, family, and household use from Mike Molstead Motors, an authorized FCA dealer, in Charles City, Iowa. The Class Vehicle was delivered to Mrs. Lewis in Michigan.

9.     Plaintiffs Domingo Orozco and Irma Orozco are citizens of Florida, residing in Orange County, Florida. The Orozcos purchased a new 2019 Jeep Wrangler for personal, family, and household use from Huntington Jeep Chrysler Dodge Ram, an authorized FCA dealer, in Huntington, New York. The Orozcos were citizens of New York at the time they purchased their Class Vehicle.

10.     Plaintiff Christopher Carano is a citizen of New York, residing in Selden, New York. Plaintiff Carano purchased a new 2018 Jeep Wrangler for

personal, family, and household use from Smith Haven Chrysler Jeep Dodge, an authorized FCA dealer, in Saint James, New York.

11.    Plaintiff Mark Bordelon is a citizen of Louisiana, residing in Lake Charles, Louisiana. Plaintiff Bordelon purchased a new 2018 Jeep Wrangler for personal, family, and household use from Mark Dodge Chrysler Jeep Ram, an authorized FCA dealer, in Lake Charles, Louisiana.

12.    Plaintiff Antoine Louvat is a citizen of Maine, residing in West Paris, Maine. Plaintiff Louvat purchased a new 2020 Jeep Gladiator for personal, family, and household use from Bournival Jeep, an authorized FCA dealer, in Portsmouth, New Hampshire.

13.    Plaintiff Justin Navin is a citizen of Florida, residing in Fort Pierce, Florida. Plaintiff Navin purchased a new 2018 Jeep Wrangler for personal, family, and household use from Vatland Chrysler Jeep Dodge Ram, an authorized FCA dealer, in Vero Beach, FL.

14.    Plaintiff Raynell McDaniel is a citizen of Illinois residing in Verona, Illinois. Mrs. McDaniel purchased a used 2018 Jeep Wrangler for personal, family, and household use from Heller Motors, an authorized FCA dealer, in Pontiac, Illinois.

15.    Plaintiff Richard Alvater is a citizen of New Jersey, residing in Bridgewater, New Jersey. Plaintiff Alvater purchased a new 2020 Jeep Wrangler for

personal, family, and household use from Criswell Chrysler Jeep Dodge, an authorized FCA dealer in in Gaithersburg, Maryland.

16.     Plaintiff Jose Gomez is a citizen of Minnesota, residing in Rogers, Minnesota. Plaintiff Gomez purchased a Certified Pre-Owned 2019 Jeep Wrangler for personal, family, and household use from Luther Brookdale Chrysler Jeep Dodge Ram, an authorized FCA dealer, in Brooklyn Park, Minnesota.

17.     Defendant, FCA, is a Delaware limited liability company with its principal place of business in Auburn Hills, Michigan. FCA's sole member is FCA North America Holdings LLC, a Delaware limited liability company with its principal place of business in South Lyon, Michigan. At all times relevant to this action, FCA and/or its agents designed, manufactured, marketed, sold, serviced, distributed, and warranted the Class Vehicles throughout the United States; and partly because Plaintiffs and the Class purchased and leased Class Vehicles, Defendant specifically benefited by earning hundreds of millions of dollars in profits.

18.     FCA also developed, approved, and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles, to which Plaintiffs were exposed. Previously known as Chrysler Group LLC, FCA was the North American arm of Fiat Chrysler Automobiles N.V. (or "Fiat"), until its merger with Peugeot S.A., when it became a wholly-owned

subsidiary of Stellantis, N.V., which was formed as a result of the merger of Fiat Chrysler Automobiles N.V. and Peugeot S.A. in 2020.

## III.    JURISDICTION AND VENUE

19.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1332(d) and 1453, because (1) this action is a "class action," which contains class allegations and expressly seeks certification of a proposed class of individuals; (2) the putative Classes each consist of at least hundreds of proposed class members; (3) the citizenship of at least one class member is different from FCA's citizenship; and (4) the aggregate amount in controversy by the claims of Plaintiffs and the putative Classes exceeds $5,000,000, exclusive of interest and costs.

20.    This Court also has jurisdiction over supplemental state law claims pursuant to 28 U.S.C. §1367 by virtue of diversity jurisdiction being exercised under the Class Action Fairness Act ("CAFA").

21.    Venue is proper in this jurisdiction pursuant to 28 U.S.C. §1391 because FCA is subject to personal jurisdiction in this District and a substantial portion of the conduct complained of herein occurred in this District.

## IV.    FACTUAL ALLEGATIONS

**A.    Background of the Corporate Average Fuel Economy Standard and the Class Vehicles**

22.    In 1975, to reduce energy consumption by increasing the fuel economy of cars and light trucks or Sport Utility Vehicles ("SUV"), Congress enacted the

Corporate Average Fuel Economy ("CAFE") standards as part of the implementation of the Energy Policy and Conservation Act. Initially, the CAFE standards required all new automobiles manufactured for sale in the U.S. to have an average of 27.5 miles per gallon ("mpg") by 1985.

23.     In 1987, Jeep introduced its iconic Jeep Wrangler. Today, the Wrangler is still one of the most recognized vehicles, both on and off roads, in the United States. Since its inception, the Wrangler's appearance has largely remained unchanged, earning it a loyal, decades long consumer base.

24.     In May 2010, the Environmental Protection Agency ("EPA") and the Department of Transportation ("DOT") issued a joint final rule mandating, by 2016, improved fuel economy to 34.1 mpg for light trucks with model years 2012-2016.

25.     In October 2012, the EPA and DOT finalized a rule requiring, by 2025, increased fuel efficiency to 54.5 mpg for new trucks with model years 2017-2025.

26.     Notwithstanding these continued regulatory changes, throughout Fiat's acquisition of Chrysler, between 2009 and 2014, Jeep's global sales remained among the highest in the market. Since the acquisition was completed in 2014, the Jeep Wrangler has sold more than double the number of vehicles in the U.S., per year, compared with all but one year (2007) from the previous decade (2000-2010).

27.     In October 2014, Chrysler's then CEO, Sergio Marchionne, announced that FCA was considering using aluminum instead of steel for the body panels of the

fourth-generation Wrangler, which would help drop the weight of the Wrangler. This change was initially slated to be released for the 2017 model year.

28. By May 2015, Mr. Marchionne confirmed that the next-generation Wrangler would be equipped with an aluminum hood, doors, and fenders to reduce the Wrangler's weight, and in July 2016 FCA announced that it would invest $700 million in the Toledo Assembly Complex—the factory that has produced Wranglers since 2006—to produce the next-generation (and lighter) Jeep Wrangler.

29. Following this investment, and with the release of its fourth-generation 2018 models in the fall of 2017, the Wrangler included the major design change of incorporating aluminum into the vehicles' body and chassis to improve fuel efficiency and ensure that, notwithstanding increasingly stringent regulatory requirements, Wrangler would continue to be among one of the top vehicles within FCA's fleet. As background, the weight of the prior Wrangler models placed it near the bottom of the industry for real-world fuel economy and emissions performance.

30. As more specifically described below, even though FCA quickly became aware that the new, aluminum design of the Wrangler could not handle the advanced construction techniques and process changes that had been implemented, FCA continued to incorporate aluminum into the subsequent model-year Wranglers.

31. In the Spring of 2019, FCA released the 2020 Jeep Gladiator—Jeep's first new truck in almost 30 years—with the addition of a truck bed to the Wrangler's

appearance to deliver more utility to the vehicle. The Gladiator, being based on the Wrangler, incorporated the same aluminum panels and parts. As such, the Class Vehicles all suffer from the same design and/or manufacturing Defect that causes its aluminum body panels to prematurely corrode and aluminum body parts to bubble, flake, peel, rust and/or blister.

**B.**     **FCA's Knowledge of the Corrosion Defect and Contemporaneous Marketing of the Class Vehicles**

32.     Prior to the launch of the all-new 2018 Jeep Wrangler, FCA embarked on an aggressive marketing campaign that promoted the vehicle as "[t]he most capable SUV ever."

33.     FCA also boasted that the 2018 Jeep Wrangler "receive[d] a multitude of improvements" to "the legendary Jeep capability," all "while reducing weight and improving fuel economy." FCA further noted how the 2018 Jeep Wrangler was "built with a focus on quality, reliability and durability" and had "undergone more than 3.9 million miles of testing – one of the highest totals ever for any FCA US vehicle."

34.     In its brochures, FCA boasted that the 2018 Wrangler was "LIGHTER IN WEIGHT," noting that "[h]igh-strength, lightweight aluminum is used throughout the doors, hood, windshield frame, swing gate, and fenders to help Wrangler shed over 200 lb. It's strong, durable and aids efficiency." FCA also highlighted that the 2018 Wrangler had "EASIER-TO-REMOVE DOORS," noting

that "[a]ll-aluminum construction makes these doors strong, yet very lightweight, and a built-in handle makes taking them off a breeze[,]" and that its "LIGHTWEIGHT SWING GATE," was "[c]onstructed of high-strength magnesium and aluminum that reduces overall vehicle weight and aids efficiency and operation," as well as "[n]ew exposed aluminum-forged door hinges." *Id.*

35. FCA's marketing also noted that the 200 less pounds of weight was expected to increase the gas mileage by three miles per gallon, touting the 2018 Wrangler as "the most capable and fuel-efficient Wrangler ever produced by FCA."

36. However, prior to publishing these marketing materials, upon information and belief, FCA would have required its suppliers to test the aluminum to see how it performed in simulated real-world conditions and to determine its effect on other aspects of the vehicle, such as its paint.[1]

37. Thus, FCA would have engaged in *at least* four years of development and testing of the aluminum parts prior to incorporating them into the Class vehicles. Such testing would have begun by the time FCA confirmed, in May 2015, that it would be incorporating new aluminum parts into the next generation Jeep Wrangler.

---

[1] Prior to a new metal being used in the substrate of a vehicle's exterior, automakers such as FCA typically employ multiple standards and test protocols to ensure long life and film integrity of the paint system as well as the underlying substrate. This is particularly true when the incorporation of a new metal has the propensity to cause cross-metal contamination and affect the exterior panels and clearcoat of a vehicle. These tests often run over the course of two to five years before the vehicle using the new materials is brought to market.

In fact, in mid-2015, FCA redesigned the door hinges used on the Wrangler to avoid galvanic corrosion that had been occurring in the earlier generation Jeep Wrangler models, and FCA, again, redesigned the door hinges for the 2018 Jeep Wrangler.

38.    As a result, while details regarding the testing performed by FCA and the results of that testing are in the exclusive custody and control of FCA, the testing of the aluminum to be used in the Class Vehicles would have revealed the Corrosion Defect. Upon information and belief, FCA's observed problems with the new aluminum components was one of the reasons why FCA delayed the release of the new fourth-generation Jeep Wrangler to the 2018 model year.

39.    Soon after FCA's release of the 2018 Jeep Wrangler on November 29, 2017, Class members began posting and complaining about their experiences with the Corrosion Defect in their Class Vehicles on internet forums created specifically for the discussion of issues related to the Class Vehicles. FCA actively monitors these internet forums through its "JeepCares" customer service representatives. These complaints, of which FCA had actual notice through JeepCares, also detailed FCA representative and authorized dealership responses.

40.    In fact, when FCA joined JeepCherokeeClub.com, on April 4, 2016, it made clear that online customer complaints would *not* merely be a blip on FCA's radar; instead FCA personnel would actively "monitor a myriad of FCA brand forums" to ensure customer satisfaction and resolution of issues:

Hi all, sorry for the delay!

There are several of us who monitor a myriad of FCA brand forums. We are Customer Care representatives from FCA HQ and are here to assist when you have questions or concerns with your vehicle. For customers outside the United States, we can help by providing contact information for our international teams.

Kori

Jeep Social Care Specialist

41.     Other forums specific to the Class Vehicles that were monitored by FCA where Class members posted their complaints pertaining to the Corrosion Defect in the Class Vehicles include WranglerForum.com, JLWranglerForum.com, and JeepGladiatorForum.com. JeepCares joined these forums on July 19, 2011; February 1, 2018; and November 29, 2018, respectively.

42.     The complaints posted on these forums, which detailed both the failures and the responses of FCA representatives and FCA authorized dealerships in addressing the Corrosion Defect and the damage it caused, began in early 2018 and were consistently responded to by JeepCares representatives, often the next day. A review of these forums reveals thousands of posts in dozens of discussions complaining of the Corrosion Defect, demonstrating that Plaintiffs are not alone in this matter.

43.     FCA, however, knew of the Corrosion Defect in the Class Vehicles even prior to their release, as evidenced by the first of many TSBs it issued to address the Defect during the Class period.

44.     To wit, on or around March 17, 2018, FCA issued 31-001-18, entitled "Aluminum Body Panel Corrosion Repair" (the "2018 TSB"),[2] which acknowledged the Corrosion Defect in the 2018 Jeep Wrangler and involved "inspecting and if necessary removing corrosion and refinishing the suspect aluminum hood, door, or liftgate panel" in those vehicles.

45.     The 2018 TSB diagnosed the problem as "[a]luminum corrosion along the leading edge of hood or other exterior surface areas of the doors or liftgates" and directed FCA's dealers to "[r]emove [the] affected panel" and "[g]rind the corroded areas of the hood to bare aluminum using . . . a grinding disc" before sanding the panel and preparing it to be refinished.

46.     In an attempt to enhance the adhesive properties and corrosion resistance of the coating being applied to the Class Vehicles, the 2018 TSB further directed dealers to apply pre-treatment wipes to the repair areas prior to refinishing

---

[2]     Automakers issue TSBs directly to dealers to address observed problems with a vehicle. Thus, upon information and belief, the 2018 TSB would have been issued after incidents of the Corrosion Defect within the 2018 Jeep Wranglers (and, then, later models) had been observed in the field and during testing prior to those vehicles being made publicly available for sale.

14

the panel. The 2018 TSB did not provide for the replacement of the affected panel under any circumstance.

47. On March 30, 2018, the 2018 TSB was revised through the issuance of 31-001-18 REV. A (the "Revised 2018 TSB"), to include the 2018-2019 Jeep Wrangler's "fenders" and also diagnosed the problem as "[a]luminum corrosion along the leading edge of hood or other exterior surface areas of the doors, fenders or liftgates."

48. Like the 2018 TSB, the Revised 2018 TSB did not provide for a replacement of the affected panel and the repair procedure remained the same.

49. On November 22, 2018, prior to the upcoming release of the 2019 Jeep Wrangler, the Revised 2018 TSB was, itself, revised through the issuance of 31-001-18 REV. B (the "Second Revised 2018 TSB").

50. The Second Revised 2018 TSB provided examples of the Corrosion Defect FCA had observed in the field after the 2018 Jeep Wrangler's release:



**Fig. 2**
**Corrosion Examples**



**Fig. 1**
**Examples of Corrosion Along Leading Edges**

51.     The Second Revised 2018 TSB also provided for replacement of the affected panel to the extent "severe pitting exhibited that [could not] be removed with sandpaper" after "removing the initial blistered paint from the panel surface with [the] grinding disc." If the affected panel did not qualify for replacement, the Second Revised 2018 TSB directed dealers to apply an anti-corrosion pen to the affected areas, instead of the pretreatment wipes recommended in the 2018 and Revised 2018 TSBs.

52.     Notwithstanding its above knowledge of the problems associated with its incorporation of aluminum into the Class Vehicles, FCA continued to market the benefits of the Vehicle's aluminum closures and make inaccurate representations regarding the quality and durability of the Vehicles themselves.

53.    Indeed, the brochure FCA released for the 2019 Jeep Wrangler marketed the fact that its "[s]ide doors are made of lightweight aluminum and are easy to remove" and that the use of "lightweight aluminum" in its body made the "Wrangler lighter in weight," but failed to note the known Corrosion Defect.

54.    On April 4, 2019, when the all-new 2020 Jeep Gladiator was released, FCA still did not disclose its knowledge of the Corrosion Defect, which it knew affected the Gladiator in the same way it had affected the 2018-2019 model year Wrangler, given the Gladiator had incorporated the same aluminum panels and parts.

55.    On July 31, 2019, FCA issued 31-001-19 (the "2019 TSB"), which superseded the Second Revised 2018 TSB, and expanded the affected vehicles beyond those sold in North America to include those sold in the regions of Latin America, Asia Pacific, and Europe. The 2019 TSB, however, did not include the 2020 Gladiator, even though FCA knew those vehicles would meet the same fate.

56.    Instead, FCA's marketing of the 2020 Jeep Gladiator was no different than its marketing of the 2018 Jeep Wrangler. Indeed, FCA hailed the 2020 Gladiator as "[t]he most capable Jeep truck ever," noting that "[t]he use of lightweight, high-strength aluminum closures, including the doors, door hinges, hood, fender flares, windshield frame and tailgate, help curtail weight and boost fuel economy."

57.    On October 27, 2020, however, FCA issued 31-002-20 (the "2020 TSB"), which superseded the 2019 TSB and included, for the first time, the Jeep

Gladiator, both model year 2020 and 2021, as well as model years 2020-2021 of the Wrangler—even though the 2021 model-year Class Vehicles had not yet been released for sale.

58. The 2020 TSB provided the below additional example of the Corrosion Defect in the doors and hinges of the Class Vehicles that FCA had observed in the field:



Fig. 1
Examples of Bubbling

59. Notwithstanding its release of the 2020 TSB, however, FCA continued to market the aluminum closures and their benefits to potential customers in the brochures it released for the 2021 model year Gladiator and Wrangler, without acknowledging or providing consumers notice of the known problems associated with its incorporation of the new aluminum closures and parts into those Class Vehicles.

60. For example, the brochures for the 2021 Gladiator, like the 2021 Wrangler, touted that its "side doors . . . are made of lightweight aluminum, which

makes them extremely easy to remove." FCA also highlighted the Gladiator's "lightweight aluminum tailgate," as well as other "lightweight aluminum" parts that "ma[de] every Gladiator lighter in weight." *Id.*

61.     FCA also did not disclose to Plaintiffs and Class members that, *inter alia*, FCA was aware of the Defect from pre-production testing and design failure mode analysis, production design failure mode analysis, early consumer complaints made to FCA's network of exclusive dealers, aggregate warranty data compiled from those dealers, repair orders and parts data received from the dealers, consumer complaints to dealers and NHTSA, as well as testing performed in response to consumer complaints.

62.     FCA's decision to continue using the aluminum body panels, notwithstanding its knowledge of the Corrosion Defect and its customers' lack of knowledge of such Defect, has caused the Defect to go unremedied with a sufficient replacement or repair to this day.

63.     Further, although FCA knew the Corrosion Defect was unknown and not reasonably discoverable by Plaintiffs and Class members before they purchased or leased their Class Vehicles, at FCA's direction, its authorized employees and agents have concealed the Defect and denied that the Corrosion Defect even exists, including through utilization of standard answers developed by FCA to dispel expected consumer complaints.

C.     **The Class Plaintiffs' Experiences**

        1.     **Connie Lewis' Experience**

64.     On or about June 13, 2018, Plaintiff Connie Lewis purchased a new 2018 Jeep Wrangler from Mike Molstead Motors in Charles City, Iowa, an authorized FCA dealer (for purposes of this section, the "Dealership"). The Class Vehicle was delivered to Plaintiff Lewis in Michigan.

65.     Prior to purchasing the Class Vehicle, Plaintiff Lewis researched the Class Vehicle. When shopping online for vehicle specifications, Plaintiff Lewis viewed and read FCA marketing materials that touted the quality, durability, and aesthetics of FCA's vehicles, including the Class Vehicle. Plaintiff Lewis spoke with a sales representative and/or other personnel at the Dealership over the phone, who emphasized the quality, durability, and aesthetic features of the Class Vehicle. Plaintiff Lewis also test drove vehicles similar to the Class Vehicle at Watson's of Rockford ("Watson's"), an authorized FCA dealer located near her residence in Michigan, and she spoke with representatives at Watson's, who emphasized the quality, durability, and aesthetic features of the Class Vehicle. In deciding to purchase the Class Vehicle, Plaintiff Lewis had no way of knowing or learning that such information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed to her by the sales representative and/or other personnel was false.

66.     Despite FCA's knowledge of the Defect, FCA failed to disclose the Corrosion Defect to Plaintiff Lewis before she purchased the Class Vehicle; therefore, she purchased the Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value. Plaintiff Lewis would not have purchased the Class Vehicle, or would not have paid as much for it, had she known of the Corrosion Defect and the propensity of the Class Vehicle's aluminum panels, including its doors and door hinges, to prematurely corrode and its exterior paint to bubble and blister.

67.     Within approximately a year of purchasing the Class Vehicle, Mrs. Lewis discovered that her Class Vehicle's components, including but not limited to the hinges and doors, began exhibiting the Corrosion Defect. Within approximately a year of purchase, Plaintiff Lewis brought her Class Vehicle to Watson's with complaints that her vehicle showed signs of the Corrosion Defect on her hinges and doors. Watson's advised she was outside the 36,000-mile warranty; thus, any repair would not be under warranty. As a result, Plaintiff Lewis contacted Jeep customer service who advised her that a repair to corrosion within 5 years is warranted.

68.     Accordingly, Plaintiff Lewis brought her vehicle back to Watson's and advised that she had contacted Jeep customer service who told her a repair was covered under warranty. Nevertheless, Watson's advised her to take her vehicle to a body shop, stating that her repair was not covered under warranty. Thereafter, in or

around November 2021, Plaintiff Lewis had her Class vehicle taken to Courtesy Chrysler Dodge Jeep in Grand Rapids, MI, an authorized FCA dealer, who advised that they would be able to repaint the Class Vehicle, but that the repainting would not cure the corrosion and, thus, Plaintiff Lewis should wait until the defect became worse so they could replace all the doors. However, the replacement doors are the same model doors as the originals, so any replacement door would have the same Corrosion Defect issues as the originals.

## 2. Domingo and Irma Orozco's Experience

69. On or about February 2, 2019, Plaintiffs Domingo and Irma Orozco (the "Orozco Plaintiffs") purchased their new 2019 Jeep Wrangler from Huntington Jeep Chrysler Dodge Ram in Huntington, New York (for purposes of this section, the "Dealership").

70. Prior to purchasing the Class Vehicle, the Orozco Plaintiffs viewed the pristine looking, new vehicle and researched the Class Vehicle by listening to commercials and speaking with sales representative at the Dealership who emphasized the quality, durability, and aesthetics of FCA's vehicles, including the Class Vehicle. The exterior appearance of the vehicle was of great importance to the Orozco Plaintiffs in making their purchasing decision. In deciding to purchase the Class Vehicle, the Orozco Plaintiffs had no way of knowing or learning that such information regarding the quality, durability, and aesthetics of the Class Vehicle

conveyed in those commercials, by the sales representative, and by the appearance of the new vehicle, was false.

71.     While washing the Class Vehicle on or about February 4, 2019, the Orozcos noticed the Corrosion Defect, including, bubbling, blistering, flaking, and peeling on the Vehicle's tailgate and front passenger side door. The same week, Mr. Orozco took the Class Vehicle to the Dealership, where Dealership personnel assessed the Class Vehicle and acknowledged the damage the Corrosion Defect had caused, agreeing to repaint the Vehicle under warranty. Mr. Orozco returned to the Dealership's body shop approximately two weeks later to pick up his Class Vehicle, but when he arrived at the Dealership, he noticed the repairs to his Vehicle had been performed inadequately, as the paint on the Orozco Plaintiffs' Class Vehicle was bubbling on its doors, fenders, and hinges.

72.     Although Mr. Orozco took time off from work to bring the Class Vehicle to the dealer, the Dealership kept the Class Vehicle for weeks, before, ultimately, refusing to fix the Corrosion Defect.

## 3.     Christopher Carano's Experience

73.     In or around November 2019, Plaintiff Christopher Carano purchased his new 2018 Jeep Wrangler from Smith Haven Chrysler Jeep Dodge in Saint James, New York (for purposes of this section, the "Dealership").

74.     For approximately a year prior to purchasing the Class Vehicle, Plaintiff Carano researched options for his next vehicle, including the Class Vehicle. From seeing approximately seven (7) television commercials, Plaintiff Carano heard and viewed FCA marketing that touted the quality, durability, and aesthetics of FCA's vehicles, including the Class Vehicle. In addition, Plaintiff Carano viewed the Class Vehicle, reviewed the Class Vehicle's window (or Monroney) sticker, and spoke with a sales representative and/or other personnel at the Dealership about the specifics of the Class Vehicle. The sales representative and/or other personnel at the Dealership emphasized the quality, durability, and aesthetic features of the Class Vehicle. When Plaintiff Carano was deciding to purchase the Class Vehicle, he had no way of knowing or learning that such information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel was false.

75.     Despite FCA's knowledge of the Defect, FCA failed to disclose the Corrosion Defect to Plaintiff Carano before he purchased the Class Vehicle. Plaintiff Carano, therefore, purchased the Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value. Plaintiff Carano would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect and the propensity of the Class

Vehicle's aluminum panels, including its doors and door hinges, to prematurely corrode and its exterior paint to bubble and blister.

76.     In or around May of 2021, Plaintiff Carano discovered his Class Vehicle's components, including, but not limited to, the hinges, doors, and tail gate, began exhibiting the Corrosion Defect. Plaintiff Carano contacted the Dealership to report the Corrosion Defect. The Dealership offered to attempt to repair his Class Vehicle in August 2021; however, because of scheduling conflicts for both Plaintiff Carano and the Dealership, the repairs were scheduled for January 2022.

77.     Accordingly, in or around January 2022, Plaintiff Carano brought his Class Vehicle to the Dealership for repairs of the Corrosion Defect. Months after it was delivered to the Dealership for repairs, on March 17, 2022, the Dealership contacted Plaintiff Carano and informed him that the hinges of his Class Vehicle were replaced; but that the Class Vehicle's doors were not replaced; instead, the doors were sanded down, reprimed, repainted, and reinstalled.

78.     As alleged herein, these repairs are inadequate. Indeed, the sanding and grinding to the aluminum before it is reprimed and repainted diminishes the Class Vehicles value. Further, upon information and belief, the repainted areas will, again, exhibit the Corrosion Defect. Likewise, because any replacement parts will have the Corrosion Defect, the new hinges are merely the beginning of a new cycle of future repairs.

### 4.　　**Mark Bordelon's Experience**

79.　　On or about June 21, 2018, Plaintiff Mark Bordelon purchased his new 2018 Jeep Wrangler from Mark Dodge Chrysler Jeep Ram in Lake Charles, Louisiana (for purposes of this section, the "Dealership" or "Mark Dodge").

80.　　Prior to purchasing the Class Vehicle, Plaintiff Bordelon researched vehicles online that would retain value and came across the Class Vehicle. In addition, Plaintiff Bordelon spoke with a sales representative at the Dealership who emphasized the quality, durability, and aesthetics of FCA's vehicles, including the Class Vehicle, and he viewed the pristine looking, new Class Vehicle and its window (or Monroney) sticker.

81.　　In or about February 2021, Plaintiff Bordelon noticed that the paint on his Class Vehicle's door hinge, frame, and rear window was bubbling and peeling. On or about February 15, 2021, Plaintiff Bordelon brought his Class Vehicle to the Dealership where Dealership personnel assessed bubbling paint that had resulted from the Corrosion Defect. After visually inspecting the door hinge, frame, and rear window on Plaintiff Bordelon's Class Vehicle, Dealership personnel took photographs of the Vehicle to document the damage caused by the Corrosion Defect. Dealership personnel then advised Plaintiff Bordelon that it would be contacting him with a plan of action. Since he had not heard back from the Dealership, Plaintiff Bordelon returned with his Class Vehicle two (2) months later, after. When he

arrived, Dealership personnel advised Plaintiff Bordelon to take his Vehicle to Martin GMC for a repair estimate of the Corrosion Defect because Mark Dodge does not have a body shop.

82. Plaintiff Bordelon followed the Dealership's advice and brought his vehicle to Martin GMC advised it would prepare an estimate for Plaintiff Bordelon's review but conveyed that Martin GMC would not warrant any repairs unless defective parts were replaced. However, Plaintiff Bordelon did not receive an estimate. Approximately two (2) weeks later, Plaintiff Bordelon went back to Martin GMC to follow up on obtaining a repair estimate. Martin GMC verbally told Plaintiff Bordelon that it would cost approximately $7,300.00 for it to repair his Vehicle and that it was still waiting on approval from Mark Dodge for the recommended repairs.

83. After over nine (9) months of waiting for an estimate for the repairs and after this lawsuit had already been initially filed, Mark Dodge recently contacted Plaintiff Bordelon directly regarding his February 2021 and April 2021 Corrosion Defect complaints and advised that they would like him to take his Vehicle in to the Bolton Ford dealership in Lake Charles, Louisiana for a repair estimate. Plaintiff Bordelon followed the Dealership's directive and brought his Vehicle to Bolton Ford for a repair estimate. In all, Plaintiff Bordelon received one estimate from Martin GMC for approximately $7,300.00 and another from Bolton Ford for $4,477.00.

84.     The Corrosion Defect has gotten worse as Plaintiff Bordelon's Vehicle continues to rust, bubble, peel on the front and rear passenger doors, the driver's side passenger door including the window, the driver's side bottom hinge, the driver's side back fender, and the driver's side top windshield.

85.     For the reasons noted herein, even if the Class Vehicle is repaired per FCA's directives and instructions, his vehicle will be worth considerably less after the subject repair than it was before the subject repair, and it will still have the Corrosion Defect.

### 5.      Antoine Louvat's Experience

86.     On or about May 9, 2020, Plaintiff Antoine Louvat purchased his new 2020 Jeep Gladiator from Bournival Jeep in Portsmouth, New Hampshire (for purposes of this section, the "Dealership").

87.     Prior to purchasing the Class Vehicle, Plaintiff Louvat researched the Class Vehicle online, and he reviewed the pristine looking, new Class Vehicle and its window (or Monroney) sticker at the Dealership. In addition, Plaintiff Louvat listened to television commercials and spoke with sales representative at authorized FCA dealerships, both within New Hampshire and Maine, who emphasized the quality, durability, and aesthetics of FCA's vehicles, including the Class Vehicle.

88.     In or about August 2020, Plaintiff Louvat noticed corrosion on the door hinges and other parts of his Class Vehicle, including the rock slider underneath the

rear bumper. On or about November 30, 2020, Plaintiff Louvat brought his Class Vehicle to an FCA authorized dealership, Bessey Motor Sales, where Dealership personnel assessed the corrosion on his Class Vehicle and said it was normal, providing no assistance or options to Plaintiff Louvat with regard to a potential repair for the Corrosion Defect.

### 6. Justin Navin's Experience

89. On or about September 19, 2018, Plaintiff Justin Navin purchased a new 2018 Jeep Wrangler from Vatland Chrysler Jeep Dodge Ram in Vero Beach, Florida (for purposes of this section, the "Dealership").

90. Prior to purchasing the Class Vehicle, Plaintiff Navin researched the Class Vehicle. In addition, Plaintiff Navin heard, viewed, and/or read FCA marketing materials that touted the quality, durability, and aesthetics of FCA's vehicles, including the Class Vehicle, and the sales representative and/or other personnel at the Dealership emphasized the quality, durability, and aesthetic features of the Class Vehicle. Plaintiff Navin had no way of knowing or learning that such information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those marketing materials and by the sales representative and/or other personnel in deciding to purchase the Class Vehicle was false.

91. FCA failed to disclose the Corrosion Defect to Plaintiff Navin before he purchased the Class Vehicle, despite FCA's knowledge of the Defect, and

Plaintiff Navin, therefore, purchased the Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value. Plaintiff Navin would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect and the propensity of the Class Vehicle's aluminum panels, including its doors and door hinges, to prematurely corrode and its exterior paint to bubble and blister.

92.     In or around February 2021, Plaintiff Navin discovered that his Class Vehicle's components, including but not limited to the hinges, doors, and hood hem, began exhibiting the Corrosion Defect. In or around December 2021, Plaintiff Navin brought his Class Vehicle to the Dealership with complaints that his vehicle showed signs of the Corrosion Defect. The Dealership advised that they would need to digitally scan the Class Vehicle, but could not do so because they were back-logged for several weeks.

93.     Since Plaintiff Navin had not heard from the Dealership about the digital scan of his Class Vehicle, in or around February of 2022, Plaintiff Navin contacted the Dealership about scheduling a digital scan of the Class Vehicle.

94.     On or about March 2, 2022, Plaintiff Navin discovered that additional components of the Class Vehicle, including but not limited to the window on the driver's side rear door, the bottom of the windshield, the top of the windshield on

the side where the top attaches to, and on all hinges on the doors and hood are exhibiting the Corrosion Defect.

95.     On or about March 2, 2022, Plaintiff Navin brought his Class Vehicle to the Dealership where it performed the digital scan of the Class Vehicle; however, Plaintiff Navin was not provided an estimated timeframe for a repair, or any information to confirm that any repair would be adequate. Further, upon information and belief, any repairs made will be inadequate due the sanding and grinding to the aluminum before it is repainted, or because the repainted areas will, again, exhibit the Corrosion Defect and because any replacement parts will, likewise, have the Corrosion Defect.

### 7.     Raynell McDaniel's Experience

96.     In or about July 20, 2019, Plaintiff Raynell McDaniel purchased her used 2018 Jeep Wrangler from Heller Motors in Pontiac, Illinois (for purposes of this section, the "Dealership").

97.     Prior to purchasing the Class Vehicle, Plaintiff McDaniel researched the Class Vehicle. From seeing several television commercials, Plaintiff McDaniel heard and viewed FCA marketing that touted the quality, durability, and aesthetics of FCA's vehicles, including the Class Vehicle. Plaintiff McDaniel spoke to a sales representative at the Dealership who emphasized the quality, durability, and aesthetic features of the Class Vehicle to her, and Plaintiff McDaniel test drove the

Class Vehicle. In deciding to purchase the Class Vehicle, Plaintiff McDaniel had no way of knowing or learning that such information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative were false.

98.     FCA failed to disclose the Corrosion Defect to Plaintiff McDaniel before she purchased the Class Vehicle, despite FCA's knowledge of the Defect, and Plaintiff McDaniel, therefore, purchased the Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value. Plaintiff McDaniel would not have purchased the Class Vehicle, or would not have paid as much for it, had she known of the Corrosion Defect and the propensity of the Class Vehicle's aluminum panels, including its doors and door hinges, to prematurely corrode and its exterior paint to bubble and blister.

99.     In or around November 2019, Plaintiff McDaniel brought her Class Vehicle to the Dealership for service. Thereafter, on or about July 5, 2021, Mrs. McDaniel brought her Class Vehicle back to the Dealership with complaints that her Class Vehicle showed signs of the Corrosion Defect, including but not limited to, paint bubbling on all four doors, hinges, the tailgate, and the hood. Plaintiff McDaniel had the vehicle repaired; however, the repaired parts have the same Corrosion Defect issues, which merely restarts the cycle of problems. Upon information and belief, any repairs made are inadequate and diminished the value of

her Vehicle due the sanding and grinding to the aluminum before it is repainted, because the repainted areas will, again, exhibit the Corrosion Defect and because replacement parts likewise, have the Corrosion Defect.

100. In fact, in or around late February, early March 2022, Plaintiff McDaniel noticed that her vehicle, again, showed signs of the Corrosion Defect on her hinges, doors, and hood.

### 8. Richard Alvater's Experience

101. On or about August 29, 2019, Plaintiff Richard Alvater purchased a new, custom-made 2020 Jeep Wrangler from Criswell Chrysler Jeep Dodge in Gaithersburg, Maryland (for purposes of this section, the "Dealership"). Plaintiff Alvater resides in Bridgewater, New Jersey.

102. Prior to purchasing the Class Vehicle, Plaintiff Alvater researched the Class Vehicle. In addition, Plaintiff Alvater heard, viewed, and/or read FCA marketing materials that touted the quality, durability, and aesthetics of FCA's vehicles, including his custom-made Class Vehicle. Plaintiff Alvater communicated with sales representatives and/or other personnel at the Dealership regarding his custom-made vehicle and the Dealership emphasized the quality, durability, and aesthetic features of what Plaintiff Alvater expected to be, and what any reasonable person would expect to be, a new, pristine, custom-made Class Vehicle. Plaintiff Alvater had no way of knowing or learning that such information regarding the

quality, durability, and aesthetics of the Class Vehicle conveyed by the sales representative and/or other personnel in deciding to purchase the Class Vehicle was false.

103.   FCA failed to disclose the Corrosion Defect to Plaintiff Alvater before he purchased the Class Vehicle, despite FCA's knowledge of the Defect, and Plaintiff Alvater, therefore, purchased the Vehicle on the reasonable belief that it would be a high quality and durable vehicle that would retain its value. Plaintiff Alvater would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect and the propensity of the Class Vehicle's aluminum panels, including its doors and door hinges, to prematurely corrode and its exterior paint to bubble and blister.

104.   In or about November 2021, Plaintiff Alvater discovered the Corrosion Defect on the Class Vehicle when he saw that paint was bubbling on the hood, hinges, and doors of the Class Vehicle.

105.   On or about January 13, 2022, Plaintiff Alvater brought his vehicle to Fullerton Chrysler Jeep Dodge Ram ("Fullerton Chrysler"), an authorized FCA dealer in Bridgewater, New Jersey, with complaints that his vehicle showed signs of the Corrosion Defect on the hood, hinges, doors, and panels.  After this visit, Plaintiff Alvater contacted Fullerton Chrysler approximately once a week seeking an update on the repair approval and status of the potential repair. Plaintiff Alvater was advised

by Fullerton Chrysler that FCA was not offering repairs for the Corrosion Defect and that he should bring his vehicle to a Non-Dodge Chrysler Jeep Dealer for repairs.

### 9. Jose Gomez' Experience

106. On or about October 14, 2019, Plaintiff Jose Gomez purchased a Certified Pre-Owned 2019 Jeep Wrangler from Luther Brookdale Chrysler Jeep Dodge Ram in Brooklyn Park, Minnesota (for purposes of this section, the "Dealership").

107. Prior to purchasing the Class Vehicle, Plaintiff Gomez researched the Class Vehicle online, through Defendant's website, and by viewing the Class Vehicle, and the Class Vehicle's window (or Monroney) sticker. In addition, Plaintiff Gomez test drove the Class Vehicle at the Dealership prior to purchasing the Class Vehicle. Further, Plaintiff Gomez heard, observed, and/or read FCA marketing materials that touted the quality, durability, and aesthetics of FCA's vehicles, including the Class Vehicle, and the sales representative and/or other personnel at the Dealership emphasized the quality, durability, and aesthetic features of the Class Vehicle. Plaintiff Gomez had no way of knowing or learning that such information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed online and by the sales representative and/or other personnel in deciding to purchase the Class Vehicle was false.

108. FCA failed to disclose the Corrosion Defect to Plaintiff Gomez before

he purchased the Class Vehicle, despite FCA's knowledge of the Defect; and Plaintiff Gomez, therefore, purchased the Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value. Plaintiff Gomez would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect and the propensity of the Class Vehicle's aluminum panels, including its doors and door hinges, to prematurely corrode and its exterior paint to bubble and blister.

109.   In or around the summer of 2020, Plaintiff Gomez discovered that his Class Vehicle's components, including but not limited to the hinges and hood hem, began exhibiting the Corrosion Defect. In or around August 2020 Plaintiff Gomez brought his Class Vehicle to Luther Brookdale Chrysler Jeep Dodge Ram, an authorized FCA dealership, with complaints that his vehicle showed signs of the Corrosion Defect on at least three (3) hinges. The dealership advised this was common and then sanded, grinded, and repainted the hinges; however, the repainted parts have the same Corrosion Defect issues.

110.   In or around April 2021, Plaintiff Gomez brought his Class Vehicle to the Dealership again, with complaints that his vehicle showed signs of the Corrosion Defect on the hood. The dealership sanded and repainted the hood again; yet, once more, the repaired parts have the same Corrosion Defect. As a result of the inadequate repair, his vehicle is worth considerably less after the subject repair, than

it was before the subject repair.

111.    Plaintiffs have suffered a concrete and ascertainable loss as a direct and proximate result of FCA's misconduct in that Plaintiffs overpaid for their Class Vehicles at the time of purchase, and the value of their Class Vehicles has been diminished as a result of the Corrosion Defect.

**D.    <u>The Applicable Warranties are Misleading, Deceptive, and Illusory</u>**

112.    FCA sold the Class Vehicles with a Basic Limited Warranty ("BLW"), which provides bumper-to-bumper coverage for a period of 36 months or 36,000 miles, whichever occurs first.

113.    The BLW states:

> The Basic Limited Warranty covers the cost of all parts and labor needed to ***repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation***. There is no list of covered parts since the only exception are tires and Unwired headphones. ***You pay nothing for these repairs***. These warranty repairs or adjustments — including all parts and labor connected with them — will be made by an authorized dealer at no charge, using new or remanufactured parts.

114.    In addition, FCA sold the Class Vehicles with a Corrosion Warranty ("CW"), which provides coverage for corrosion to all "sheet metal panels" for a period of 36 months, with no mileage limit. Recognizing the importance consumers placed on the exterior of their vehicles, the CW provided for extended warranty coverage of a period of 60 months for corrosion to "an outer-body sheet metal

panel," which FCA defined as "one that is finish-painted and that someone can see when walking around the vehicle."

115. The CW also states:

This warranty covers the cost of all parts and labor needed to repair or replace any sheet metal ***panels that get holes from rust or other corrosion***. If a hole occurs because of something other than corrosion, this warranty does not apply. Cosmetic or surface corrosion — resulting, for example, from stone chips or scratches in the paint — is not covered. For more details on what isn't covered by this warranty, see 3.5.

116. While the CW appears to require that the Class Vehicles' aluminum panels be perforated from corrosion, the CW does not exclude coverage for "[c]osmetic or surface corrosion" resulting from a defect "in material, workmanship or factory preparation" – the type of corrosion at issue here – only such corrosion resulting from "stone chips or scratches in the paint." Nor does the CW exclude coverage for cosmetic or surface corrosion resulting from a FCA design and/or manufacturing defect in Section 3.5 of the CW, referenced above. Instead, Section 3.5 states:

Your warranties don't cover the following:

• Corrosion caused by accident, damage, abuse, or vehicle alteration;

• Surface corrosion caused by such things as industrial fallout, sand, salt, hail, ocean spray, and stones;

• Corrosion caused by the extensive or abnormal transport of caustic materials like chemicals, acids, and fertilizers; and

- Corrosion of special bodies, body conversions, or equipment that was not on your vehicle when it left the manufacturing plant or was not supplied by FCA US.

117.   It is widely known throughout the automotive industry that aluminum body panels do not perforate from corrosion, and thus, FCA knew that customers who had purchased the Class Vehicles could never take advantage of the CW to the extent perforation of the panel was a requirement to obtain coverage. Accordingly, the extended warranty coverage provided by FCA for "an outer-body sheet metal panel" was, in and of itself, misleading, deceptive and, at best, illusory.

118.   However, instead of modifying the extended warranty so that customers could obtain coverage for the repairs necessitated by the Corrosion Defect, FCA concealed its inadequacy from consumers, and continued to provide them with its sham extended corrosion warranty. Because the CW appears to only apply if the body panel becomes perforated due to corrosion, and aluminum body panels cannot perforate from corrosion, the entirety of the CW is illusory.

119.   Moreover, to date, FCA has been unable to provide a permanent remedy that truly repairs the Corrosion Defect or prevents it from recurring. Accordingly, FCA's representations that it would "repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation" were materially false to the extent that it could not (and did not intend to) repair the Corrosion Defect as it was obligated to do under the CW.

**E.** **The Agency Relationship Between FCA and Its Network of Authorized Dealerships**

120. In order to sell vehicles to the general public, FCA enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new, FCA vehicles, including the Jeep-branded vehicles at issue here, the authorized dealerships are also permitted to service and repair these vehicles under the warranties FCA provides directly to consumers who purchased new vehicles from the authorized dealerships.

121. Accordingly, FCA's authorized dealerships are FCA's agents, and the consumers who purchased or leased the Class Vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their Class Vehicles locally.

122. Further, Plaintiffs and Class members are the intended beneficiaries of FCA's express warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under FCA's warranty agreements, which were designed for and intended to benefit the consumers only. Consumers, such as Plaintiffs and Class members, are the true intended beneficiaries of FCA's express warranties and may, therefore, avail themselves of those warranties.

123. FCA issued the express warranty to the Plaintiffs and Class members. FCA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. FCA also is responsible for the content of the Monroney Stickers on Jeep-branded vehicles, which are necessarily seen by all customers. Because FCA issues the express warranty directly to the consumers, the consumers are in direct privity with FCA with respect to the warranties.

124. In promoting, selling, and repairing its defective vehicles, FCA acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive FCA representatives and agents. That the dealers act as FCA's agents is demonstrated by the following facts:

a) The authorized FCA US LLC dealerships complete all services and repairs according to FCA's instructions, which FCA issues to its authorized dealerships through service manuals, TSBs, technical tips, and other documents;

b) Consumers are able to receive services under FCA's issued New Vehicle Limited Warranty only at FCA's authorized dealerships, and they are able to receive these services because of the agreements between FCA and the authorized dealers. These agreements provide FCA with a significant amount of control over the actions of the authorized dealerships;

c)     The warranties provided by FCA for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

d)     FCA dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

e)     FCA controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with FCA's authorization;

f)     FCA has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers' interaction with the public; and

g)     FCA implemented its express warranties as they relate to the Defect alleged herein by instructing authorized FCA dealerships to address complaints of the Corrosion Defect by prescribing and implementing the relevant TSBs cited herein.

125.   Indeed, FCA's warranty booklets make it abundantly clear that FCA's authorized dealerships are FCA's agents for vehicle sales and service. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at its "authorized dealerships." For example, at the outset, FCA notifies Plaintiffs and Class members in the warranty booklet that "**[w]arranty service must be done by an authorized Chrysler,**

**Dodge, Jeep or Ram dealer**" and that "**[t]hey know you and your vehicle best, and are most concerned that you get prompt and high quality service**." Further, the booklets state that the "warranty problems can be resolved by an authorized dealer's sales or service departments." *Id*. The booklets further direct Plaintiffs and Class members, should they have a problem or concern, to "always talk to an authorized dealer's service manager or sales manager first." *Id*. FCA then directs Plaintiffs and Class members to first, "[d]iscuss your problem with the owner or general manager of the authorized dealership," and if that is unsatisfactory, to second, "contact the FCA US LLC Customer Assistance Center." *Id*.

126.   Accordingly, the authorized dealerships are agents of FCA. Plaintiffs and each of the Class members have had sufficient direct dealings with either FCA or its agent dealerships to establish privity of contract between FCA, on the one hand, and Plaintiffs and each Class member, on the other hand. This establishes privity with respect to the express warranty between Plaintiffs and Defendant.

**F.     FCA's Inadequate Remedy for the Corrosion Defect**

127.   As evidenced by the repair instructions in the five TSBs issued by FCA, repainting the Class Vehicles, even if done properly, does not cure the Corrosion Defect and does not remedy the diminution of value that occurs from repainting because, *inter alia*, repainting the Class Vehicles requires sanding and grinding of the areas suffering from the Corrosion Defect.

128.   Further, for all the Class Vehicles, the factory paint was applied to exacting tolerances consistently over all aluminum panels, whereas the TSB repair process is haphazard, at best, and results in paint inconsistencies relative to appearance and longevity. FCA knew the TSB repair procedures were inadequate at the time they were implemented, yet it concealed that fact from Plaintiffs and the Class members.

129.   Even if the Class Vehicles were properly repainted, their values would still be diminished, as repainted newer vehicles are worth less than vehicles with original paint. Indeed, there is a stigma associated with a repainted vehicle, and the fact that a vehicle has been repainted is often used by a potential buyer as a bargaining chip to lower the price.

130.   In addition, anticipated car purchasers often shy away from a vehicle that has been repainted, as it rings alarm bells that the vehicle may have been damaged in an accident and repainted as a result. A non-original paint job could also be an indication of major body repairs to a vehicle that are being hidden, not to mention rust.

131.   According to an online poll conducted by CarMax, 72% of respondents said that repainting the car is the strongest indicator of vehicle damage. In fact, CarMax states that repainting is one of the biggest warning signs indicating a vehicle

may have been in a major accident, and instructs consumers to do the following to determine whether a used car may have been in a serious accident:

> Look for signs of repainting on the car, such as inconsistency in the paintwork or paint on the molding or gaskets. Run your finger along the inside of the door edge and see if the finish is smooth or rough. A rough finish can be caused by overspray during repainting. If signs of repainting are found, ask additional questions to determine if the paintwork was for minor scratches and dents or to cover up more serious vehicle damage.

132.    Paint work to a vehicle typically shows up on a CARFAX Vehicle History Report, as such repairs are often reported by the dealerships or body shops performing them. Even if it is not, paint work can easily be identified through the use of a paint meter, which is used by dealers when evaluating vehicles for trade-in purposes. In the case of the Class Vehicles, given the nature of the Corrosion Defect and the inadequate repainting of the Vehicles, the paint work can be identified by potential buyers with the naked eye and without the use of a paint meter.

133.    CarMax's vehicle appraisals are determined, among other criteria, by its inspection of a "car's condition both inside and out," and it notes that "major defects" can impact their offers. CarMax significantly lowers the appraised values for vehicles, including Class Vehicles that have been repainted.

134.    Kelley Blue Book ("KBB") similarly bases its appraisals on the condition of the vehicle. KBB divides the condition of used vehicles into the following four grades:

**Excellent** condition means that the ***vehicle looks new***, is in excellent mechanical condition and needs no reconditioning. ***This vehicle has never had any paint or body work*** and is free of rust. The vehicle has a clean Title History and will pass a smog and safety inspection. The engine compartment is clean, with no fluid leaks and is free of any wear or visible defects. The vehicle also has complete and verifiable service records. Less than 5 percent of all used vehicles fall into this category.

**Good** condition means that the vehicle is ***free of any major defects***. This vehicle has a clean Title History, the paint, ***body and interior have only minor (if any) blemishes***, and there are no major mechanical problems. There should be little or no rust on this vehicle. The tires match and have substantial tread wear left. A "good" vehicle will need some reconditioning to be sold at retail. Most consumer owned vehicles fall into this category.

**Fair** condition means that the ***vehicle has some*** mechanical or ***cosmetic defects*** and needs servicing but is still in reasonable running condition. This vehicle has a clean Title History, ***the paint, body*** and/or interior ***need work performed by a professional***. The tires may need to be replaced. There may be some repairable rust damage.

**Poor** condition means that the ***vehicle has severe*** mechanical and/or ***cosmetic defects*** and is in poor running condition. The vehicle may have problems that cannot be readily fixed such as a damaged frame or a rusted-through body. A vehicle with a branded title (salvage, flood, etc.) or unsubstantiated mileage is considered "poor." A vehicle in poor condition may require an independent appraisal to determine its value.

## G.   The Damage Caused by the Corrosion Defect

135.   Plaintiffs and Class members purchased or leased the Class Vehicles based on their reasonable but mistaken belief that their Vehicles were of high quality, durable, and free of defects. However, the Class Vehicles delivered by FCA were not those for which Plaintiffs and Class members bargained. Rather, the Class Vehicles suffered from a common defect – the Corrosion Defect. Had Plaintiffs and

Class members known of the Corrosion Defect, they would have either: (a) paid substantially less for the Class Vehicles; (b) required an immediate remedy that restored the Vehicles to the conditions bargained for; or (c) not purchased or leased the Class Vehicles.

136.    As a result of the disparity between the quality and value of the Class Vehicles negotiated for and the Vehicles actually received, Plaintiffs and Class members suffered economic harm. This economic harm can be quantified as: (a) the economic value of an effective remedy that places the Class Vehicles' value to the value represented at the time of sale (or the economic harm from the lack of that remedy); (b) the discounted value that Plaintiffs and Class members would have required to obtain the Vehicles for their actual value; and/or (c) the diminished value of the Vehicles, both those that have been sanded and repainted and those that have not.

137.    Plaintiffs and Class members paid premiums to purchase and lease the Class Vehicles as a result of the brand, quality, durability, and value representations made by FCA. A vehicle purchased or leased with the reasonable expectation that it is of high quality and durable as advertised is worth more than a vehicle known to be subject to the problems or risks associated with the Corrosion Defect. Plaintiffs and Class members were harmed from the day they drove their Class Vehicles off

the lot because they did not get what they paid for – a high-quality and durable vehicle that would retain its value under normal conditions.

138.   As a direct result of FCA's false and deceptive representations and omissions, Plaintiffs and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain. Plaintiffs and Class members paid a premium for the Class Vehicles, which FCA advertised as being durable and of high-quality, and received Vehicles that contained a known but concealed defect. FCA profited because it obtained and retained monies paid by Plaintiffs and Class members who paid a price for the Class Vehicles that was higher than the value of the vehicles they received in return.

139.   It is inequitable and unjust for FCA to maintain the benefits of such revenue and profits derived directly from the Class members by way of their payments for their Class Vehicles.

140.   In addition, the widespread disclosure of the Corrosion Defect has caused a decrease in the value of the Class Vehicles, and, therefore, Plaintiffs and Class members have suffered a direct pecuniary loss in the form of the decreased value of their Vehicles, even if the Corrosion Defect has allegedly not yet exhibited signs of manifesting because each Class Vehicle suffers from the same Corrosion Defect.

141.   As a result of FCA's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose the Corrosion Defect and the problems associated therewith, owners and lessees of the Class Vehicles have suffered losses in money and/or property.

**H.      Fraudulent Concealment Allegations**

142.   Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at FCA responsible for disseminating false and deceptive marketing materials and information regarding the Class Vehicles. FCA necessarily is in possession of, or has access to, all of this information.

143.   Plaintiffs' claims arise out of FCA's false, deceptive, and fraudulent concealment of the Corrosion Defect and the paint failures and premature rusting and corrosion it causes, and its representations about the quality, durability, and value of the Class Vehicles.

144.   To the extent that Plaintiffs' claims arise from FCA's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims. Plaintiffs allege that at all relevant times, including specifically at the time they purchased or leased their Class Vehicles, FCA knew, or was reckless in not knowing, of the Corrosion Defect; FCA was under a duty to disclose the Corrosion Defect based upon its exclusive knowledge of it, its

affirmative representations about it, and its concealment of it, but FCA never disclosed the Corrosion Defect to Plaintiffs or the public at any time or place or in any manner.

145. Plaintiffs make the following specific fraud allegations with as much specificity as possible, although they do not have access to information necessarily available only to FCA:

a) *Who*: FCA actively concealed the Corrosion Defect from Plaintiffs and Class members while simultaneously touting the quality and durability of the Class Vehicles. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at FCA responsible for such decisions.

b) *What*: FCA knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Corrosion Defect. FCA concealed the Corrosion Defect and made contrary representations about the quality and durability, and other attributes of the Class Vehicles.

c) *When*: FCA concealed material information regarding the Corrosion Defect at all times and made representations about the quality and durability of the Class Vehicles, starting no later than 2004, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day. FCA has

not disclosed the truth about the Corrosion Defect in the Class Vehicles to anyone outside of FCA. FCA has never taken any action to inform consumers about the true nature of the Corrosion Defect in Class Vehicles. Additionally, when consumers brought their Class Vehicles to FCA complaining of the paint peeling, flaking, bubbling off, corroding, or rusting off their Vehicles, FCA denied any knowledge of, or responsibility for, the Corrosion Defect, and in many instances, blamed owners/lessees for causing the problem.

        d)     *Where*: FCA concealed material information regarding the true nature of the Corrosion Defect in the communications it had with Plaintiffs and Class members and made contrary representations about the quality and durability of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing in which FCA disclosed the truth about the Corrosion Defect in the Class Vehicles to anyone outside of FCA. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on FCA's website.

        e)     *How*: FCA concealed the Corrosion Defect from Plaintiffs and Class members and made representations about the quality and durability of the Class Vehicles. FCA actively concealed the truth about the existence and nature of the Corrosion Defect from Plaintiffs and Class members, at all times, even though it knew about the Corrosion Defect and knew that information about the Corrosion

Defect would be important to a reasonable consumer. FCA also promised in its marketing materials that the Class Vehicles have qualities that they do not have, and moreover, made representations in its warranties that it knew were false, misleading, and deceptive.

f) **_Why_**: FCA actively concealed material information about the Corrosion Defect in Class Vehicles for the purpose of inducing Plaintiffs and Class members to purchase or lease the Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the quality and durability of the Vehicles. Had FCA disclosed the truth, for example, in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers, including Class members) would have been aware of it, and they would not have bought the Class Vehicles or would have paid less for them.

## I.    <u>Tolling of the Statute of Limitations</u>

### _Fraudulent Concealment Tolling_

146.   FCA has known of the Corrosion Defect in the Class Vehicles since at least 2004, and has concealed from, or failed to, notify Plaintiffs, Class members, and the public of the full and complete nature of the Corrosion Defect, even when directly asked about it by Plaintiffs and Class members during communications with FCA, FCA Customer Assistance, FCA dealerships, and FCA service centers. FCA continues to conceal the Corrosion Defect to this day.

147. Any applicable statute of limitation has, thus, been tolled by FCA's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### Estoppel

148. FCA was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles. FCA actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Vehicles. Plaintiffs and Class members reasonably relied upon FCA's knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing, FCA is estopped from relying on any statutes of limitation in defense of this action.

### Discovery Rule

149. Certain causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their Class Vehicles contained the Corrosion Defect.

150. However, Plaintiffs and Class members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after the Corrosion Defect caused the paint on their Class Vehicles to peel, flake, bubble, corrode, or rust.

151. Even then, Plaintiffs and Class members had no reason to know the peeling, flaking, bubbling, corrosion, or rusting were caused by a defect in the Class Vehicles because of FCA's active concealment of the Corrosion Defect. Not only did FCA fail to notify Plaintiffs or Class members about the Corrosion Defect, FCA, in fact, denied any knowledge of, or responsibility for, the Defect when directly asked about it, and, in many instances, actually blamed the owner/lessee for causing the problem.

152. Thus, Plaintiffs and Class members were not reasonably able to discover the Corrosion Defect until after they had purchased or leased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest, they discovered that the Defect was causing paint failures and premature corrosion on their Vehicles.

## V.   CLASS ALLEGATIONS

153. Plaintiffs bring this action pursuant to Rule 23(a) and (b)(2)-(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated as members of the following Nationwide Class (under the laws of the state of Michigan) and State Classes defined as:

> **Nationwide Class:**
>
> All persons or entities in the United States (including its territories and the District of Columbia) that purchased or leased a Class Vehicle, consisting of Jeep Wranglers,

model years 2018-2021, and Jeep Gladiators, model years 2020-2021.

**Florida Class:**

All persons or entities that purchased or leased a Class Vehicle in the state of Florida, consisting of Jeep Wranglers, model years 2018-2021, and Jeep Gladiators, model years 2020-2021.

**Illinois Class:**

All persons or entities that purchased or leased a Class Vehicle in the state of Illinois, consisting of Jeep Wranglers, model years 2018-2021, and Jeep Gladiators, model years 2020-2021.

**Louisiana Class:**

All persons or entities that purchased or leased a Class Vehicle in the state of Louisiana, consisting of Jeep Wranglers, model years 2018-2021, and Jeep Gladiators, model years 2020-2021.


**Maryland Class:**

All persons or entities that purchased or leased a Class Vehicle in the state of Maryland, consisting of Jeep Wranglers, model years 2018-2021, and Jeep Gladiators, model years 2020-2021.

**Michigan Class:**

All persons or entities that purchased or leased a Class Vehicle in the state of Michigan, consisting of Jeep Wranglers, model years 2018-2021, and Jeep Gladiators, model years 2020-2021.

**Minnesota Class:**
All persons or entities that purchased or leased a Class Vehicle in the state of Minnesota, consisting of Jeep Wranglers, model years 2018-2021, and Jeep Gladiators, model years 2020-2021.

**New Hampshire Class:**

All persons or entities that purchased or leased a Class Vehicle in the state of New Hampshire, consisting of Jeep Wranglers, model years 2018-2021, and Jeep Gladiators, model years 2020-2021.

**New York Class:**

All persons or entities that purchased or leased a Class Vehicle in the state of New York, consisting of Jeep Wranglers, model years 2018-2021, and Jeep Gladiators, model years 2020-2021.

**New Jersey Class:**

All persons or entities that reside in the state of New Jersey and purchased or leased a Class Vehicle, and/or all persons or entities that purchased or leased a Class Vehicle in the state of New Jersey, consisting of Jeep Wranglers, model years 2018-2021, and Jeep Gladiators, model years 2020-2021.

154. Excluded from the Class are FCA; its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of FCA; FCA's dealers; Class Counsel and their employees; the judicial

officers and their immediate family members and associated court staff assigned to this case; and all persons within the third degree of relationship to any such persons.

155. Certification of Plaintiffs' claims for Class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

156. This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Fed. R. Civ. P. 23.

157. **Numerosity**. Rule 23(a)(1) of the Federal Rules of Civil Procedure: The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are at least thousands of Class members, the precise number of Class members is unknown to Plaintiffs but may be ascertained from FCA's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

158. **Commonality and Predominance**. Rules 23(a)(2) and (b)(3) of the Federal Rules of Civil Procedure: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to:

a) whether FCA engaged in the conduct alleged herein;

b) whether FCA designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

c) whether FCA designed, manufactured, marketed, and distributed Class Vehicles with a Corrosion Defect;

d) whether Plaintiffs and Class members overpaid for their Class Vehicles and/or did not receive the benefit of the bargain;

e) whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, in what amount;

f) whether FCA's alleged conduct constitutes the use or employment of an unconscionable commercial practice, deception, fraudulent concealment, false pretense, false promise, and misrepresentation within the meaning of the applicable state consumer fraud statutes;

g) whether FCA has been unjustly enriched so that its receipt and retention of the profits derived from Plaintiffs and Class members is inequitable;

h) whether FCA actively concealed the Corrosion Defect in order to maximize profits to the detriment of Plaintiffs and Class members; and

i) such other common factual and legal issues as are apparent from the allegations and causes of action asserted in this Complaint.

159. **Typicality**. Rule 23(a)(3) of the Federal Rules of Civil Procedure: Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through FCA's wrongful conduct as described above. All claims seek recovery on the same legal theories and are based upon FCA's common course of conduct.

160. **Adequacy**. Rule 23(a)(4) of the Federal Rules of Civil Procedure: Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class' interests will be fairly and adequately protected by Plaintiffs and their counsel.

161. **Declaratory Relief**. Rule 23(b)(2) of the Federal Rules of Civil Procedure: FCA has acted or refused to act on grounds generally applicable to Plaintiffs and Class members, thereby making appropriate declaratory relief, with respect to each Class as a whole.

162. **Superiority**. Rule 23(b)(3) of the Federal Rules of Civil Procedure: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to

the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for Class members to individually seek redress for FCA's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.   CLAIMS

### COUNT I

### UNJUST ENRICHMENT (NATIONWIDE)

163.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

164.   On behalf of themselves and the Nationwide Class, Plaintiffs bring this cause of action under the common law of unjust enrichment, which is materially uniform in all states.

165.   Plaintiffs' claim for unjust enrichment is supported because the alleged warranties are misleading, deceptive, and illusory as they offered no legitimate coverage for the Corrosion Defect, which FCA knew but intentionally concealed.

166. In this regard, FCA manufactured, marketed, and sold defective Class Vehicles to Plaintiffs and Class members, while actively concealing the Class Vehicles' known defects and touting the durability and quality of the Class Vehicles, including the quality and benefits of the aluminum used on the Class Vehicles.

167. Plaintiffs and Class members elected to purchase or lease the Class Vehicles based on FCA's false and deceptive representations. FCA knew and understood that it would (and did) receive a financial benefit, and voluntarily accepted the same from Plaintiffs and Class members when they elected to purchase or lease the Class Vehicles.

168. The Class Vehicles' defect, and FCA's concealment of the same, enriched FCA beyond its legal rights by securing through deceit, falsehoods, and omissions millions of dollars in revenues since 2017.

169. Plaintiffs and the members of the Nationwide Class directly conferred a benefit on FCA in the form of their payments for their Class Vehicles, and FCA has received millions in revenue from the sale of the Class Vehicles since 2017 and continues to receive millions in revenue from the sale of the Class Vehicles to this day. In so doing, FCA has disregarded the rights of Plaintiffs and members of the Nationwide Class.

170.     Further, this revenue was a benefit conferred upon FCA by Plaintiffs and Class members, individuals living across the United States, and FCA's acceptance and retention of such benefits under the circumstances is inequitable.

171.     FCA benefitted from selling defective Class Vehicles for more money than they were worth, at a profit, and Plaintiffs have overpaid for the Class Vehicles and, in some instances, been forced to pay to (unsuccessfully) repair the Corrosion Defect.

172.     Therefore, because FCA will be unjustly enriched if it is allowed to retain the revenues obtained through falsehoods, deception, and omissions, Plaintiffs and each Class member are entitled to recover the amount by which FCA was unjustly enriched at his or her expense.

173.     Accordingly, Plaintiffs, on behalf of themselves and each Class member, seek damages against FCA in the amounts by which it has been unjustly enriched at Plaintiffs' and each Class member's expense. Plaintiffs also respectfully request this Honorable Court to enter judgment in favor of the Plaintiffs and the Nationwide Class on account of FCA's unjust enrichment and compel FCA to disgorge in a common fund for the benefit of Plaintiffs and Nationwide Class members all wrongful or inequitable proceeds it received. A constructive trust should be imposed upon all wrongful or inequitable sums received by FCA traceable to Plaintiffs and the members of the Nationwide Class.

## COUNT II

## VIOLATIONS OF FLORIDA'S DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT
## (FLA. STAT. §501.201, *et seq.*)

174.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

175.   Plaintiff Navin (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the Florida Class.

176.   Plaintiff and the Florida Class members are "consumers" within the meaning of FLA. STAT. §501.203(7).

177.   FCA is engaged in "trade" or "commerce" within the meaning of FLA. STAT. §501.203(8).

178.   The Florida Deceptive and Unfair Trade Practices Act ("Florida DUTPA") makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. §501.204(1).

179.   In the course of its business, FCA violated the Florida DUTPA by knowingly misrepresenting and intentionally concealing material facts regarding the quality and benefits of the aluminum used on the Class Vehicles, the existence of the Corrosion Defect, and FCA's inability to render an adequate repair for the Corrosion Defect.

180. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, FCA engaged in one or more of the following unfair or deceptive acts or practices prohibited by FLA. STAT. §501.204(1):

a) representing that the Class Vehicles have characteristics or benefits that they do not have;

b) representing that the Class Vehicles are of a particular standard and quality when they are not;

c) advertising the Class Vehicles with the intent not to sell them as advertised;

d) engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

e) using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles.

181. FCA's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Florida Class, all acting as reasonable consumers. Had Plaintiff and the Florida Class known that the represented value of the Class Vehicles were not the true value of the Class Vehicles they would receive,

they would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

182. Acting as reasonable consumers, Plaintiff and the Florida Class members had no way of discerning that FCA's representations were false and misleading, or otherwise learning the facts that FCA had concealed or failed to disclose.

183. In the course of its business, FCA had an ongoing duty to Plaintiff and the Florida Class members to refrain from unfair and deceptive practices under the Florida DUTPA. Specifically, FCA owed Plaintiff and the Florida Class members a duty to disclose all the material facts noted herein concerning the Class Vehicles, including the true value of the Class Vehicles.

184. Plaintiff and the Florida Class members suffered an ascertainable loss and actual damages as a direct and proximate result of, *inter alia*, paying the represented value of the Class Vehicles though, in truth, the Class Vehicles they received were of far less value that represented by FCA.

185. Plaintiff and the Class are entitled to: (a) recover their actual damages, pursuant to FLA. STAT. §501.211(2); (b) a declaratory judgment to the effect that FCA has engaged in violation of the Florida DUTPA as set forth in FLA. STAT. §501.211(1); and (c) attorneys' fees under FLA. STAT. §501.211 and/or FLA. STAT. §501.2105(1).

## COUNT III

## VIOLATION OF ILLINOIS CONSUMER FRAUD AND
## DECEPTIVE BUSINESS PRACTICES ACT
## (815 ILCS 505/1, *et seq.* and 510/2)

186. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

187. Plaintiff Raynell McDaniel (for the purposes of this section, "Plaintiff") brings this claim on behalf of herself and the Illinois Class.

188. FCA, Plaintiff and the Illinois Class members are "persons" within the meaning of 815 ILL. COMP. STAT. 505/1(c) and 510/1(5).

189. The Illinois Class members are "consumers" within the meaning of 815 ILL. COMP. STAT. 505/1(e).

190. The Illinois Consumer Fraud and Deceptive Practices Act ("Illinois CFA") makes unlawful "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILL. COMP. STAT. 505/2.

191. The Illinois CFA further makes unlawful deceptive trade practices undertaken in the course of business. 815 ILL. COMP. STAT. 510/2.

192. FCA participated in misleading, false, or deceptive practices that violated the Illinois CFA. By failing to disclose and actively concealing the Corrosion Defect, by marketing the high quality, durability, and aesthetics of FCA's Class Vehicles, and by presenting itself as a reputable manufacturer that stood behind its vehicles after they were sold, FCA engaged in deceptive business practices prohibited by the Illinois CFA.

193. In the course of its business, FCA engaged in unfair and deceptive business practices in violation of the Illinois CFA by knowingly misrepresenting and intentionally concealing material facts regarding the quality and benefits of the aluminum used on the Class Vehicles, the existence of the Corrosion Defect, and FCA's ability to render an adequate repair for the Corrosion Defect, as detailed above.

194. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

195. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, FCA engaged in one or more of the following unfair

or deceptive acts or practices prohibited by 815 ILL. COMP. STAT. 505/2 and 510/2:

a)      representing that the Class Vehicles have characteristics or benefits that they do not have;

b)      representing that the Class Vehicles are of a particular standard and quality when they are not;

c)      advertising the Class Vehicles with the intent not to sell them as advertised;

d)      engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

e)      using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles, whether or not any person has in fact been misled, deceived, or damaged thereby.

196.   FCA's scheme and concealment of the true characteristics of the Class Vehicles were material to the Illinois Class members, and FCA misrepresented, concealed, or failed to disclose the truth with the intention that the Illinois Class members would rely on the misrepresentations, concealments, and omissions.  Had

they known the truth, the Illinois Class members would not have purchased or leased the Class Vehicles or would have paid significantly less for them.

197.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Illinois Class members, about the Class Vehicles, the quality of the FCA brand, and the devaluing of the Class Vehicles.

198.   The Illinois Class members had no way of discerning that FCA's representations were false and misleading, or otherwise learning the facts that FCA had concealed or failed to disclose.

199.   In the course of its business, FCA had an ongoing duty to the Illinois Class members to refrain from unfair and deceptive practices under the Illinois CFA. Specifically, FCA owed the Illinois Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the Illinois Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

200.   FCA knew or should have known that its conduct violated the Illinois CFA.

201.   FCA's unlawful acts and practices complained of herein affect the public interest.

202. The Illinois Class members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

203. Pursuant to 815 ILL. COMP. STAT. 505/10a(a) and 510/3, Plaintiff and the Illinois Class members seek monetary relief against FCA in the amount of actual damages.

204. Plaintiff and the Illinois Class members also seek an order enjoining FCA's unfair and/or deceptive acts or practices, awarding damages, attorney's fees, and any other just and proper relief available under the 815 ILCS 505/1 *et seq.*

## COUNT IV

## VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA. REV. STAT. § 51:1401, *et seq.*)

205. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

206. Plaintiff Mark Bordelon (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the Louisiana Class.

207. FCA, Plaintiff, and the Louisiana Class are "persons" within the meaning of the LA. REV. STAT. § 51:1402(8).

208. Plaintiff and the Louisiana Class are "consumers" within the meaning of LA. REV. STAT. § 51:1402(1).

209. FCA engaged in "trade" or "commerce" within the meaning of LA. REV. STAT. § 51:1402(10).

210. The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." LA. REV. STAT. § 51:1405(A).

211. In the course of its business, FCA violated the Louisiana CPL by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality and benefits of the aluminum used on the Class Vehicles, the existence of the Corrosion Defect, and FCA's inability to render an adequate repair for the Corrosion Defect.

212. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, FCA engaged in one or more of the following unfair or deceptive acts or practices which are prohibited by the Louisiana CPL:

(a) causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

(b) representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

(c) representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

(d)     advertising the Class Vehicles with the intent not to sell or lease them as advertised;

(e)     engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

(f)     Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

213.   FCA's scheme and concealment of the true characteristics of the Class Vehicles were material to the Louisiana Class, and FCA misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Louisiana Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Louisiana Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

214.   Plaintiff and the Louisiana Class members had no way of discerning that FCA's representations were false and misleading, or otherwise learning the facts that FCA had concealed or failed to disclose.

215. FCA had an ongoing duty to Plaintiff and the Louisiana Class members to refrain from unfair and deceptive practices under the Louisiana CPL in the course of its business. Specifically, FCA owed Plaintiff and the Louisiana Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Louisiana Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

216. Plaintiff and the Louisiana Class members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

217. FCA's violations present a continuing risk to Plaintiff and the Louisiana State Class, as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

218. Pursuant to LA. REV. STAT. § 51:1409, Plaintiff and the Louisiana State Class seek an order enjoining FCA's unfair and/or deceptive acts or practices, and awarding damages, and any other just and proper relief available under the Louisiana CPL.

## COUNT V

## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
### (MICH. COMP. LAWS §445.903, *ET SEQ.*)

219. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

220. Plaintiff Connie Lewis (for the purposes of this section, "Plaintiff") brings this claim on behalf of herself and the Michigan Class.

221. Plaintiff and the Michigan Class members are "persons" within the meaning of MICH. COMP. LAWS §445.902(1)(d).

222. The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." MICH. COMP. LAWS §445.903(1).

223. In the course of its business, FCA violated the Michigan CPA by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality and benefits of the aluminum used on the Class Vehicles, the existence of the Corrosion Defect, and FCA's inability to render an adequate repair for the Corrosion Defect.

224. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, FCA engaged in one or more of the following unfair or deceptive acts or practices which are prohibited by the Louisiana CPL: "I Representing that goods or services have … characteristics … that they do not have";

"(e) Representing that goods or services are of a particular standard … if they are of another"; "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. LAWS §445.903(1).

225. FCA's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Michigan Class, and FCA misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Michigan Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Michigan Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

226. Plaintiff and the Michigan Class members had no way of discerning that FCA's representations were false and misleading, or otherwise learning the facts that FCA had concealed or failed to disclose.

227. In the course of its business, FCA had an ongoing duty to Plaintiff and the Michigan Class members to refrain from unfair and deceptive practices under the Michigan CPA. Specifically, FCA owed Plaintiff and the Michigan Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Michigan Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

228. FCA's unfair or deceptive acts or practices were likely to, and did, in fact, deceive reasonable consumers, including the Michigan Class.

229. Plaintiff and the Michigan Class members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

230. The repairs offered and instituted by FCA are not adequate because, such repairs either dimmish the value of the Class Vehicle or merely replace defective parts with replacement parts that have the identical Corrosion Defect.

231. The Michigan Class members seek injunctive relief to enjoin FCA from continuing its unfair, unlawful, and/or deceptive practices; monetary relief against FCA, measured as the greater of: (a) actual damages in an amount to be determined at trial; and (b) statutory damages in the amount of $250 for each Michigan Class

member, reasonable attorneys' fees, and any other just and proper relief available under MICH. COMP. LAWS §445.911.

## COUNT VI

### VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT (MINN. STAT. §325F.68, *et seq*.)

232. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

233. Plaintiff Jose Gomez (for the purposes of this section, "Plaintiff") brings this claim on behalf of him/herself and the Minnesota Class.

234. FCA, Plaintiff and the Minnesota Class members are "persons" within the meaning of MINN. STAT. §325F.68(3). The Class Vehicles are "merchandise" within the meaning of MINN. STAT. §325F.68(2).

235. The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." MINN. STAT. §325F.69(1).

236. In the course of its business, FCA violated the Minnesota CFA by knowingly misrepresenting and intentionally concealing material facts regarding the

quality and benefits of the aluminum used on the Class Vehicles, the existence of the Corrosion Defect, and FCA's ability to render an adequate repair for the Corrosion Defect, as detailed above.

237. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, FCA engaged in one or more of the following unfair or deceptive acts or practices prohibited by the Minnesota CFA:

a) representing that the Class Vehicles have characteristics or benefits that they do not have;

b) representing that the Class Vehicles are of a particular standard and quality when they are not; and/or

c) advertising the Class Vehicles with the intent not to sell them as advertised.

238. FCA's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Minnesota Class, and FCA misrepresented, concealed, or failed to disclose the truth with the intention that the Minnesota Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Minnesota Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

239. Plaintiff and the Minnesota Class members had no way of discerning that FCA's representations were false and misleading, or otherwise learning the facts that FCA had concealed or failed to disclose.

240. In the course of its business, FCA had an ongoing duty to Plaintiff and the Minnesota Class members to refrain from unfair and deceptive practices under the Minnesota CFA. Specifically, FCA owed Plaintiff and the Minnesota Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Minnesota Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

241. Plaintiff and Minnesota Class members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

242. Pursuant to the Minnesota CFA, and MINN. STAT. §8.31(3a), Plaintiff and the Minnesota Class members seek an order awarding actual damages together with costs and disbursements, including costs of investigation and reasonable attorneys' fees as well as equitable relief to be determined by the Court, and any other just and proper relief available under the Minnesota CFA.

## COUNT VII

## VIOLATION OF MINNESOTA UNIFORM DECEPTIVE
## TRADE PRACTICES ACT
## (MINN. STAT. §325D.43-48, *et seq.*)

243. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

244. Plaintiff Jose Gomez (for the purposes of this section, "Plaintiff") brings this claim on behalf of him/herself and the Minnesota Class.

245. FCA, Plaintiff and the Minnesota Class members are "persons" within the meaning of MINN. STAT. §325D.44.

246. The Class Vehicles are "goods" within the meaning of MINN. STAT. §325D.44.

247. The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person: "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have"; "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; and "(9) advertises goods or services with intent not to sell them as advertised." MINN. STAT. §325D.44.

248. In the course of its business, FCA violated the Minnesota DTPA by knowingly misrepresenting and intentionally concealing material facts regarding the quality and benefits of the aluminum used on the Class Vehicles, the existence of the Corrosion Defect, and FCA's inability to render an adequate repair for the Corrosion Defect, as detailed above.

249. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, FCA engaged in one or more of the following unfair or deceptive acts or practices as defined in MINN. STAT. §325D.44:

a)     representing that the Class Vehicles have characteristics and benefits that they do not have;

b)     representing that the Class Vehicles are of a particular standard and quality when they are not; and/or

c)     advertising the Class Vehicles with the intent not to sell them as advertised.

250. FCA's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Minnesota Class members, and FCA misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Minnesota Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Minnesota

Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

251. The Minnesota Class members had no way of discerning that FCA's representations were false and misleading, or otherwise learning the facts that FCA had concealed or failed to disclose.

252. FCA had an ongoing duty to Plaintiff and the Minnesota Class members to refrain from unfair and deceptive practices under the Minnesota DTPA in the course of its business. Specifically, FCA owed Plaintiff and the Minnesota Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Minnesota Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

253. Plaintiff and the Minnesota Class members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

254. Pursuant to MINN. STAT. §§8.31(3a) and 325D.45, Plaintiff and the Minnesota Class members seek actual damages, together with costs and disbursements, including costs of investigation and reasonable attorneys' fees as

well as equitable relief to be determined by the Court and any other just and proper relief available under the Minnesota DTPA.

## COUNT VIII

### VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### (N.H. Rev. Stat. Ann. § 358-a:1, *et seq.*)

255. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

256. Plaintiff Antoine Louvat (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the New Hampshire Class.

257. FCA and the New Hampshire Class members are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. REV. STAT. ANN. §358-A:1(I).

258. FCA's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. REV. STAT. ANN. §358-A:1(II).

259. The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: … [r]epresenting that goods or services have … characteristics, … uses, benefits, or quantities that they do not have; … [r]epresenting that goods or services are of a particular standard, quality, or grade, … if they are of another; … [and] [] [a]dvertising goods or services with intent not to sell them as advertised." N.H. REV. STAT. ANN. §358A:2(V), (VII), and (IX).

260. In the course of its business, FCA violated the New Hampshire CPA by knowingly misrepresenting and intentionally concealing material facts regarding quality of the Class Vehicles, the quality and benefits of the aluminum parts used on the Class Vehicles, the existence of a repair for the Corrosion Defect, and FCA's inability and to render an adequate repair.

261. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, FCA engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the New Hampshire CPA:

(a) representing that the Class Vehicles have characteristics or benefits that they do not have;

(b) representing that the Class Vehicles are of a particular standard and quality when they are not; and/or

(c) advertising the Class Vehicles with the intent not to sell them as advertised.

262. FCA's scheme and concealment of the true characteristics of the Class Vehicles were material to the New Hampshire Class members, and FCA misrepresented, concealed, or failed to disclose the truth with the intention that the New Hampshire Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, the New Hampshire Class

members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

263. The New Hampshire Class members had no way of discerning that FCA's representations were false and misleading, or otherwise learning the facts that FCA had concealed or failed to disclose.

264. FCA had an ongoing duty to the New Hampshire Class members to refrain from unfair and deceptive practices under the New Hampshire CPA in the course of its business. Specifically, FCA owed the New Hampshire Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the New Hampshire Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

265. The New Hampshire Class members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

266. Pursuant to N.H. REV. STAT. ANN. §358A:10, the New Hampshire Class members seek an order awarding damages, or $1,000, whichever is greater, or, since FCA exhibited a willful or knowing violation of this statute, award as much as 3 times, but not less than 2 times, such amount, as well as award the costs of the

suit and reasonable attorney's fees, as determined by the court and any other just and proper relief available under the New Hampshire CPA.

## COUNT IX

### DECEPTIVE ACTS OR PRACTICES IN VIOLATION OF NEW YORK LAW (N.Y. GEN. BUS. LAW §349)

267. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

268. Plaintiffs Domingo and Irma Orozco (for the purposes of this section, "Plaintiffs") brings this claim on behalf of themselves and the New York Class.

269. Plaintiffs and the New York Class members are "persons" within the meaning of New York General Business Law ("New York GBL"), N.Y. GEN. BUS. LAW §349(h).

270. FCA is a "person," "firm," "corporation," or "association" within the meaning of N.Y. GEN. BUS. LAW §349.

271. The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW §349.

272. In the course of its business, FCA violated the New York GBL by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality of the Class Vehicles, the quality and benefits of the aluminum panels used on the Class Vehicles, the existence of the Corrosion Defect, the existence of a

repair for the Corrosion Defect, and FCA's ability and intention to render such a repair.

273. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, FCA engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the New York GBL:

a) representing that the Class Vehicles have characteristics or benefits that they do not have;

b) representing that the Class Vehicles are of a particular standard and quality when they are not;

c) advertising the Class Vehicles with the intent not to sell them as advertised;

d) failing to state a material fact if the failure deceives or tends to deceive; and/or

e) knowingly concealing, suppressing, or omitting any material fact with the intent that consumers rely on the same.

274. FCA's scheme and concealment of the true characteristics of the Class Vehicles were material to the New York Class, and FCA misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the New York Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiffs and the New York Class members would not

have purchased or leased the Class Vehicles or would have paid significantly less for them.

275. Plaintiffs and the New York Class members had no way of discerning that FCA's representations were false and misleading, or otherwise learning the facts that FCA had concealed or failed to disclose.

276. In the course of its business, FCA had an ongoing duty to Plaintiffs and the New York Class members to refrain from unfair and deceptive practices under the New York GBL. Specifically, FCA owed Plaintiffs and the New York Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiffs and the New York Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

277. Plaintiffs and the New York Class members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

278. Pursuant to N.Y. GEN. BUS. LAW §349, Plaintiffs and the New York Class members seek an order awarding damages, treble damages, reasonable attorneys' fees and costs, and any other just and proper relief available under the New York GBL.

## COUNT X

## VIOLATION OF THE NEW YORK FALSE ADVERTISING ACT
## (N.Y. GEN. BUS. LAW §350)

279. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

280. Plaintiffs Domingo and Irma Orozco (for the purposes of this section, "Plaintiffs") bring this claim on behalf of themselves and the New York Class.

281. FCA was engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. GEN. BUS. LAW §350.

282. N.Y. GEN. BUS. LAW §350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity. . ." N.Y. GEN. BUS. LAW §350-a.

283. FCA caused to be made or disseminated through New York, advertising, marketing, other publications, and statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known, to FCA to be untrue and misleading to consumers including Plaintiffs and the New York Class members.

284.   FCA   violated   N.Y.   GEN.   BUS.   LAW   §350   because   the misrepresentations and omissions regarding the quality of the Class Vehicles and the quality and benefits of the aluminum used on the Class Vehicles were material and likely to deceive a reasonable consumer. FCA also violated N.Y. GEN. BUS. LAW §350 as a result of its misrepresentations and omissions regarding the lack of existence of a repair for the Corrosion Defect and FCA's inability to render an adequate repair.

285.   Plaintiffs and the New York Class members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

286.   Pursuant to N.Y. GEN. BUS. LAW §350-e, Plaintiffs and the New York Class members seek monetary relief against FCA measured as the greater of: (a) actual damages in an amount to be determined at trial; and (b) statutory damages in the amount of $500 for each of Plaintiffs and the New York Class members.  Because FCA's conduct was committed willfully and knowingly, Plaintiffs and the New York Class members are entitled to recover three times actual damages, up to $10,000 each since FCA acted willfully or knowingly as well as reasonable attorneys' fees and costs.

# COUNT XI[3]

## VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT
## (MD. CODE COM. LAW § 13-301, *et seq.*)

287.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

288.   Plaintiff Richard Alvater (for the purposes of this section, "Plaintiff") bring this claim on behalf of themselves and the Maryland Class.

289.   The sale of the Class Vehicles to the Plaintiff and Maryland Class under the guise that it was free from the Corrosion Defect, which substantially impairs the value of the Class Vehicle, and represents an unlawful or deceptive trade practice under MD Code, Commercial Law, § 13-301, *et seq*.

290.   In the course of Defendant's business, it willfully failed to disclose and actively concealed that the Class Vehicles are defective. Defendant's failure to disclose the defects and their ramifications offends public policy and is unethical, unscrupulous, and substantially injurious to consumers. Defendant also made affirmative misstatements, as set forth herein.

---

[3]   As noted *supra*, Mr. Alvater purchased a new, 2020 Jeep Wrangler from Criswell Chrysler Jeep Dodge in Gaithersburg, Maryland. Mr. Alvater resides in Bridgewater, New Jersey. Consequently, Counts XI and XII are brought in the alternative, and Plaintiff will select his remedy pursuant to either Maryland law or New Jersey law, *infra*, at the appropriate time.

291. Defendant engaged in unfair methods of competition, and unfair or deceptive acts or practices, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have and otherwise engaging in conduct likely to deceive.

292. Specifically, and as alleged above, Defendant knew or should have known that about the quality and benefits of the aluminum used in the Class Vehicles, the existence of the Corrosion Defect, and FCA's inability to render an adequate repair for the Corrosion Defect.

293. The facts concealed or not disclosed by Defendant to Plaintiff are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the subject vehicles.

294. Had Plaintiff known that the subject vehicles were defective at the time of purchase, they would not have purchased the subject vehicles.

295. In addition, FCA's and refusal to adequately repair the subject vehicles is likewise an unfair and deceptive practice.

296. Further, FCA violated MD Code, Commercial Law, § 13-301, *et seq.*, in one or more of the following ways:

    a.    making of fraudulent and/or negligent representations, as herein before alleged;

b. representing the subject vehicles to be of good, merchantable quality, free of defects, when in fact they were not;

c. failing to reveal material facts including, but not limited to, the nature of the nonconformities and defects complained of herein.

297. The Defendant is in the business of selling private automobiles and therefore the violations are likely to affect the general public, now and in the future.

298. The Defendant violated the law willfully and knowingly. Pursuant to MD Code, Commercial Law, § 13-301, *et seq.*, Plaintiff and the Maryland Class seek an order enjoining FCA's unfair and/or deceptive acts or practices, and awarding damages, as well as reasonable attorneys' fees and costs pursuant to Md. Code Comm. Law §13-408(b), and any other just and proper relief available under the Maryland's Unfair and Deceptive Trade Practices, MD Code, Commercial Law, § 13-301, *et seq.*

## COUNT XII

### VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT
### (N.J. STAT. ANN. §56:8-1, et seq.)

299. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

300. Plaintiff Richard Alvater (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the New Jersey Class.

301. FCA, Plaintiff, and the New Jersey Class members are "persons" within the meaning of N.J. STAT. ANN. §56:8-1(d).

302. FCA engaged in "sales" of "merchandise" within the meaning of §56:8-1(c) and (e).

303. The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. STAT. ANN. §56:8-2.

304. In the course of its business, FCA violated the New Jersey CFA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles, the quality and benefits of the aluminum panels used on the Class Vehicles, the existence of the Corrosion Defect, the existence of a repair for the Corrosion Defect, and FCA's ability and intention to render such a repair. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective

Class Vehicles, FCA engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the New Jersey CFA:

a)  representing that the Class Vehicles have characteristics or benefits that they do not have

b)  representing that the Class Vehicles are of a particular standard and quality when they are not; and/or

c)  advertising the Class Vehicles with the intent not to sell them as advertised.

305.  FCA's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the New Jersey Class members, and FCA misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the New Jersey Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the New Jersey Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

306.  Plaintiff and the New Jersey Class members had no way of discerning that FCA's representations were false and misleading, or otherwise learning the facts that FCA had concealed or failed to disclose.

307.  FCA had an ongoing duty to Plaintiff and the New Jersey Class members to refrain from unfair and deceptive practices under the New Jersey CFA

in the course of its business. Specifically, FCA owed Plaintiff and the New Jersey Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the New Jersey Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

308.   Plaintiff and the New Jersey Class members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

309.   Pursuant to N.J. STAT. ANN. §56:8-19, Plaintiff and the New Jersey Class members seek an order awarding damages, treble damages, attorney's fees, and any other just and proper relief available under the New Jersey CFA.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Class and State Classes, respectfully request that the Court certify the proposed Classes, including designating the named Plaintiffs as representatives of their respective State Classes and appointing the undersigned as Class Counsel, and the designation of any appropriate issue classes, under the applicable provisions of Federal Rule of Civil Procedure 23, and that the Court enter judgment in Plaintiffs' favor and against FCA including for the following relief:

(i)      A declaration that any applicable statutes of limitations are tolled due to FCA's fraudulent concealment and that FCA is estopped from relying on any statutes of limitations as a defense;

(ii)      Restitution, compensatory damages, and costs for economic loss and out-of- pocket costs;

(iii)      Reimbursement and compensation of the full purchase price for any repairs or replacements purchased by a Plaintiff or Class member to remedy the Corrosion Defect;

(iv)      In the alternative, reimbursement for the difference of the amounts paid for the marketed value of the Class Vehicles as compared to the actual value of the Class Vehicles received.

(v)      A determination that FCA is financially responsible for all Class notices and the administration of Class relief;

(vi)      Any applicable statutory or civil penalties;

(vii)      An order requiring FCA to pay both pre-judgment and post-judgment interest on any amounts awarded;

(viii)      An award of reasonable counsel fees, plus reimbursement of reasonable costs, expenses, and disbursements, including reasonable allowances for investigation and the fees of experts;

(ix)     Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

(x)     Any such other and further relief the Court deems just and equitable.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiffs and Class members hereby demand a trial by jury, pursuant to Federal Rule of Civil Procedure, of all issues so triable.

Dated: March 18, 2022.     Respectfully submitted,

**KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT**

By *ial/s/ Jason H. Alperstein*
Jason H. Alperstein
Kristen Lake Cardoso
1 West Las Olas Boulevard, Suite 500
Fort Lauderdale, FL 33301
Telephone:  (954) 525-4100
Facsimile:  (954) 525-4300
E-mail:   alperstein@kolawyers.com
cardoso@kolawyers.com

Steven G. Calamusa
Geoff S. Stahl
Rachel A. Bentley
**GORDON & PARTNERS, P.A.**
4114 Northlake Boulevard
Palm Beach Gardens, FL 33410
Telephone: (561) 799-5070
Facsimile: (561) 799-4050
E-mail:    scalamusa@fortheinjured.com
gstahl@fortheinjured.com
rbentley@fortheinjured.com

Nicholas E. Kyriakopoulos (MI/P76442)
NK LAW
4190 Telegraph Road, Ste. 1000
Bloomfield Hills, MI 48302
Telephone: (248) 723-4747
Facsimile: (247) 723-4690
E-mail:   nick@nklawmi.com

*Counsel for Plaintiffs and the
Proposed Classes*

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2022, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notification of such filing to the e-email addresses denoted on the Electronic Mail Notice List.

*/s/ Jason H. Alperstein*
Jason H. Alperstein